PRICE *v.* STATE.

In Banc. June 13, 1949.

No. 37355. (41 So. (2d) 37).

**Stone & Stone,** for appellant.

R. O. **Arrington**, Assistant Attorney General, for appellee.

**Hall, J.**

This is an appeal from a judgment of conviction and death sentence against appellant, a Negro, for the murder of his child of the age of three years.

Appellant obtained a high school diploma and had one year of college work at Alcorn College, after which he held responsible teaching positions, and was employed one year as an assistant to the county agricultural agent, under the emergency war food administration program. For two years just prior to the killing, he had served as principal of the colored high school at Jonesboro, Arkansas, but after the close of school he returned to Mississippi in July 1948, and obtained employment at Greenwood. About six days before the killing, he had rented an apartment at Greenwood. His wife and child were then living in an apartment with her sister in a government housing project at Grenada. He spent the night with her at that place on July 27, 1948, and left and drove his automobile back to Jonesboro, Arkansas, to finish moving some personal property which had been left there.

On the night of July 29, 1948, at about 10 P.M., he returned to Grenada and went to the apartment where his wife and child were living and called his brother-in-law, Ben Ingram, who opened the door and let him in.

There were two bedrooms and a living room in this apartment. One bedroom was occupied by Ben Ingram and his wife, Pearl Ingram. The other was rented to Willie Green. Appellant's wife occupied the living room where she slept on a studio couch, and that is where he spent the night with her two nights previously. There were two single beds in the room occupied by Willie Green. Appellant testified that when he entered the house he saw his wife come from Willie Green's room partly clad. This was denied by other witnesses. He then went

into the living room with her and they talked for nearly an hour. The child was asleep on a quilt folded on the floor between the two single beds in Willie Green's room. It had fallen asleep there shortly before dark and had not been moved.

Appellant and his wife were not getting along very harmoniously. He was trying to persuade her to go to live with him in Greenwood, and she had refused to do so. He finally asked her where he was going to sleep that night, and she told him he could sleep in the room with Willie Green. He went into that room and turned on the light and deposited his hat and traveling bag. Then he came out of the room and talked some more with his wife in the living room. Finally, he went back to the room occupied by Willie Green, and attacked Willie Green with a razor. They fought over the room, Green sustaining several cuts, and finally Ingram and his wife ejected appellant from the house. Almost immediately thereafter it was discovered that appellant's child was dead, with its throat cut almost from ear to ear. Green testified that he heard the child make one slight outcry just before appellant attacked Green.

Appellant fled the scene in his automobile and drove to Greenwood where he obtained his clothes, and then drove to Clarksdale where he was taken into custody about daylight by a city policeman.

The Clarksdale policeman advised appellant that he was under arrest for murder, and it is shown without dispute that he immediately warned appellant that anything he might say would be used against him in court. Appellant asked the policeman ''Who did they say I killed?'', and the policeman replied ''You know more about that than I do'', and appellant then stated ''Boss, I killed my baby.'' He told the policeman that his wife was living with another man and wouldn't give him the baby, and that he went to kill all of them and wanted to kill the baby first. These statements were admitted after a preliminary examination in the absence of the jury. This examination

shows that the statements were made without any promise, threat, coercion or mistreatment of any kind, and after due warning to appellant that anything he said would be used against him.

Later in the same day, two policemen from Grenada drove to Clarksdale and brought appellant back to Grenada. These policemen also warned appellant that anything he said might be used against him, and he talked with them freely and voluntarily on the return trip, without any promise, threat, coercion or mistreatment, and told them when he got to Ingram's apartment, appellant's wife Hazel was on the couch in the living room and that he went in there and made love to her and tried to get her to go home with him, and she finally told him to go into the other room and go to bed, as it was then late at night, and he went in the room and sat down on the vacant bed, and as he sat there he decided he would kill his baby and that maybe Hazel would run into the room and he would grab her and cut her throat too, and that he then removed a new razor from his baggage and opened it and took the baby's head in one hand and turned its head as he cut its throat, and then he jumped over and grabbed Willie Green and Willie grabbed his arm and they fought and went on the floor in the fall, and presently Ben Ingram and Pearl Ingram came in and got hold of him and pulled him off Green and put him out the kitchen door. These statements were admitted after a preliminary examination in the absence of the jury.

These policemen lodged appellant in the jail at Grenada, and later in the day he sent for the sheriff and said that he wanted to tell all about it. The sheriff went to the jail with six other witnesses, and appellant freely and voluntarily made a full and complete statement of the whole affair, without any promise, threat, coercion or mistreatment. This statement was taken down in writing by the chancery clerk as appellant detailed it, and was signed by appellant, and was admitted in evidence after a preliminary examination in the absence of the jury. It

116

goes into minute detail as to all of appellant's movements on the night of the crime and covers nine pages. It is unnecessary to set it out in full. In general, it follows the same pattern as appellant's two previous statements, with considerable elaboration. In it he said that when he entered the house, his wife came out of the bathroom and they went into the living room together and had a long talk, and she told him to go and sleep in the room with Green; that when he went into the room he saw his wife's red pajamas on the floor and he sat there and imagined he could see his wife in the bed with Green, and he then and there planned to kill all of them; that he removed the razor from his bag and measured his distance with a look, and bent over and slashed his baby's throat, and quickly turned to an upright position and reached with his left hand for Willie Green's head and at the same time made a stroke at his neck with his right hand, but Willie Green jumped up and knocked appellant's hand up and they fought over the room until Ben and Pearl Ingram came in and separated them and put appellant out of the house.

Appellant assigns fourteen errors and cites not one single authority to support any of them. Nevertheless, this being a capital case, we have very carefully and painstakingly gone through the whole record, and have made an independent investigation of the applicable principles of law, and we have failed to find any error in any of the actions of the lower court in the trial of this case.

■■ It is argued that the confessions should not have been admitted in evidence. The appellant did not deny making them. He testified in his own behalf and denied that his wife's pajamas were in Green's room. While denying that he cut his child, and while trying to leave the impression that it must have been accidentally cut while he and Willie Green were engaged in combat upon the floor, he had a very vivid memory of everything that occurred up to the moment when he was ejected from

the house, and from that time on he claims that he had a total "black-out" or lapse of memory for several days until he finally realized that he was in the jail at Grenada. He said that all the officials had been nice to him, that he had suffered no mistreatment, but that he simply had no recollection of any of the statements and confessions. The evidence for the prosecution shows that when these statements and confessions were made, appellant was in full possession of his mental faculties, and we find no error in their admission. McGee v. State, Miss., 40 So. (2d) 160, not yet reported in State Reports and the numerous authorities therein cited.

Appellant next argues that the killing of said child could have occurred accidentally while appellant and Willie Green were engaged in combat. It is true that the wound could have been accidentally inflicted, but there is evidence from which the jury could find that it did not occur in that manner. Appellant also argues that there was a long delay in calling the officers after the killing, that there was life insurance upon the child payable to appellant's wife, and that the child's mother may have killed it after appellant left the apartment in order to collect the insurance, rid herself of an unwanted husband by laying the crime upon him, and be free to carry on an illicit affair with her alleged paramour. All of these matters could he true, and they no doubt were the subject of much argument to the jury, but by its verdict the jury rejected these theories of the defense. "Questions of fact are peculiarly questions for the jury, and it is only where there is no testimony that would warrant a jury, if the witness was believed, in finding a verdict, that the court can take the case from the jury." Stokes v. State, 172 Miss. 199, 159 So. 294, 296.

Appellant also complains that the court below committed error in connection with the evidence as to life insurance on the deceased child. It was developed during the trial that appellant's wife had taken out a policy just two days before the killing which she subse-

quently collected. On cross-examination, appellant was asked if he did not also have a policy on the child's life, and he replied that he did but that the beneficiary therein was his wife. Then he was asked if he had not tried to effect a change of beneficiary therein so as to make it payable to himself, and he denied this, and his counsel then demanded of the district attorney that he produce a request for change of beneficiary if he had one, and the trial court remarked that the witness was under cross-examination and that the prosecution had a right to ask the question, and that the matter of insurance was wholly immaterial and had nothing to do with the case, and that "nothing about the insurance is to be considered in any way derogatory to this defendant, or derogatory to anybody else."

■■ Appellant's counsel then objected that the court's statement was the equivalent of an oral instruction to the jury upon the law of the case contrary to the express provisions of Section 1530 of the Mississippi Code of 1942, which requires all jury instructions upon the law to be in writing. The trial judge then specifically stated to the jury that he had no intention of instructing them orally about anything, that under the law of Mississippi the only instructions on the law which the jury is to consider must be given in writing, and that they would be presented in written form at the proper time. We can see nothing prejudicial in the action of the trial court in this matter. In the case of Bumpus v. State, 166 Miss. 276, 144 So. 897, 899, in construing the cited statute, this Court said: "In passing, we will say that the statute invoked does not place the judge in a strait-jacket nor prevent him from having anything to say during the progress of a trial. Of course, he should keep off of the province of the jury, and not try to influence their verdict; and while it may be safer for him to rule without giving his reasons therefor, he has the right to give such reasons if he so desires, and to show why, in his opinion, the reasons advanced for a contrary ruling are unsound. In

so doing, he may go too far and transgress the proprieties; but such is not the case here.

"It is true that 'an overspeaking judge is no well-tuned cymbal,' but, in language somewhat similar to that of Mr. Justice McReynolds, in Berger v. United States, 255 U. S. [22] 43, 41 S. Ct. 230, 65 L. Ed. [481], 489, neither is an aphonic dummy a becoming receptacle for judicial power."

■■ Appellant argues that one of the instructions for the state defining malice aforethought is erroneous because it omits reference to an accidental killing. There is little, if anything, in the record here from which an inference could be drawn by the jury that the killing was accidental, but this was a matter of defense which was fully submitted to the jury under an instruction obtained by appellant. We find no error in the instruction which was granted to the prosecution.

■■ Appellant complains of alleged error in the refusal of nine instructions requested by him. We have carefully examined all of them, and we find that eight of them were properly refused because they did not state correct principles of law applicable to the case, and the other was correctly refused because it was merely cumulative, the appellant having already obtained another instruction embodying precisely the same principles of law in exactly the same verbiage.

Finding no error in the judgment of the lower court, the same is affirmed and appellant's execution is set for Friday, July 29, 1949.