Thomas *v.* Cook

No. 40304          December 10, 1956          91 So. 2d 275

*Prewitt & Bullard,* Vicksburg, for appellant.

*Frank E. Shanahan, Jr.,* Vicksburg, for appellee.

HALL, J.

This is an action of bastardy brought by the appellee against the appellant under Sections 383-398, Code of 1942. On the trial in the circuit court she obtained a substantial judgment against the appellant, from which this appeal is prosecuted.

A peremptory instruction was granted in favor of the appellee by the lower court, and this action of the court is the basis of the first assignment of error argued. Counsel seems to contend that a peremptory instruction is never proper in a case of this nature because the

action is quasi criminal and the issue must be passed upon by a jury. In the case of Welford v. Havard, 127 Miss. 88, 89 So. 812, a case of the same nature, we said: ''The giving of the nine-jury verdict instruction and the instruction that informed the jury that they could return a verdict for the appellee on the mere preponderance of the evidence involves the consideration of one question, and that is, whether or not bastardy proceedings under Chapter 15, Code of 1906, Sections 268 to 283, inclusive, Hemingway's Code, Chapter 7, Sections 217 to 232, inclusive, is a civil or a criminal cause. The nine-jury verdict statute, Chapter 162, Laws of 1916, Hemingway's Code, Section 2214, provides that in the trial of all 'civil suits in the circuit or chancery courts of this state' nine or more jurors may agree on a verdict; and that either party may request an instruction to that effect, and it shall be the duty of the judge to give it.

''If this proceeding therefore, is a criminal and not a civil cause, clearly the giving of the nine-jury verdict instruction was error. And it is also true that if this is a criminal and not a civil cause, the giving of the instruction that the jury might return a verdict on the mere preponderance of the evidence was error, because it is universally held that in a criminal case the evidence must show the guilt of the defendant beyond a reasonable doubt.'' We went on to point out the criminal aspects of the proceeding and also the civil aspects, and then we said: ██ ██ ''By the great weight of authority, bastardy proceedings are civil proceedings and are governed by the rules of procedure applicable in such cases. It is true that a small number of courts have held that such proceedings are criminal instead of civil and are governed by the rules obtaining in criminal cases. 7 Corpus Juris, section 57.

██ ██ ''Also by the great weight of authority the parentage of the child in question may be proved by a preponderance of the evidence; proof beyond a reason-

able doubt as in criminal cases not being required. 7 Corpus Juris, Section 128. The cases bearing on these questions will be found collated in the notes to the two references above to Corpus Juris."

Under this point the appellant also argues that even if it is a civil case, under the evidence produced at the trial there was an issue of fact for decision by a jury. In the case of Thomas v. Williamson, 185 Miss. 83, 187 So. 214, where the plaintiff obtained a peremptory instruction, in passing upon the rule with reference to granting such an instruction, we said: "A summary of these latest cases, as well as of numerous others going back almost to the beginning of the judicial history of this state, is that: When all the testimony in behalf of a party litigant is taken as a whole and is considered as if undisputed by the other party, and that testimony is reconcilable in essential features with the material facts which are undisputed, and when so reconciled, and taken together with the undisputed facts, is of such a real and substantial nature that impartial men of sound judgment could reasonably believe it, and prudently act thereon, and thence it furnishes a factual basis adequate to sustain the case of the party, a peremptory instruction should not be granted against him. But if the testimony in behalf of the party does not measure up to this established standard, it is insufficient and therefore is but a scintilla, as the term is to be understood in our law. See the recent opinion of the Supreme Court of the United States on this subject in National Labor Relations Board v. Columbian, etc. Co., 59 S. Ct. 501, 83 L. Ed. 660.

"Under the record we think that the case here was one in which the scintilla rule was properly applicable, and that the action of the trial judge in granting the peremptory instruction was correct."

In this case there was no substantial dispute as to the facts. The record shows that the appellee was a registered nurse at Vicksburg, Mississippi. The appel-

lant started going with her about the first of 1951 and sometime latter they started having illicit relations. At that time she thought that he was a single man but in fact he was married and had one child by his wife. She became pregnant sometime between October 15th and November 15th, 1953. She continued to live in Vicksburg until about July 1st, 1954, when she went to Greenville and rented an apartment and held herself out to be a married woman under the name of Mrs. Fay Thomas. On August 1, 1954, another nurse who was a friend of the appellee went to Greenville and lived with her until the child was born. The appellee was without funds to pay for hospitalization and the baby was delivered in her apartment by the nurse who was living with her on August 15, 1954. Beginning on August 5, 1954, and continuing for several months thereafter the appellant wrote to the appellee 29 letters in addition to sending her a Christmas card and also sending a Christmas card to the baby. In the first three letters, which were written before he had knowledge that the baby had been born, he was very solicitous about her condition and about the prospects of the birth of the child. In one of these letters he said, ''Darling, if the baby is a boy I will think of a name for him. Sure hope you get along O. K.'' On August 17th he wrote her, ''Darling, take care of yourself and the baby and I will be looking forward to seeing you.'' Shortly after the birth of the child he visited her in Greenville. The appellee was worried about making out a birth certificate and he told her to let the birth certificate show that he was the father of the child and that it was a legitimate child. On September 9, 1954, he wrote her and said among other things, ''Take care of the girl.'' On September 14, 1954, he had just returned from a visit to see her and said, ''I sure was glad to see you and the baby. It was worth every cent it cost. * * * I have not got that picture yet. I hope nothing happens to it.''

After that letter appellee left Greenville and went to Ackerman, Mississippi, where she obtained employment as a registered nurse in a hospital. She did not advise appellant where she was until the latter part of October, when she wrote him about getting a car tag for her. On October 30th he acknowledged receipt of this letter and said, "I had been trying for a month to find you and Carolyn and find out if you are O. K. * * * Darling, please let me know when you are coming down and bring Carolyn with you so I can see her, as I want to see her very much." The name of the child is Carolyn Marie Thomas, which is the name that he suggested. On December 15, 1954, he wrote her, "Darling, I love you more than ever after the way you did by Carolyn, when most girls would have gave her away. It just goes to show what a fine girl you are. Why do you want to change her name when my name is the name she should have. You have handled this fine the way you are going so why change— for her sake it should stay as is. * * * I will be glad when you send me a large picture of Carolyn. Well I will go for now. Kiss Carolyn for me." On November 17, 1954, he wrote her, "Darling, I was so glad to see you and Carolyn Sunday. Wish I was going to get to see you this Sunday. It sure did hurt leaving you Sunday night, not knowing when I would see you again. I have sure worried about Carolyn having a cold. Hope she is better."

On December 18, 1954, appellant sent a Christmas card which reads: "Merry Christmas Daughter. A little wish at Christmas filled with happiness and cheer and love and warm affection for a daughter who's a dear. Love Daddy."

On the same date he sent a Christmas card to the appellee which contains a verse in very endearing terms. On December 7, 1954, he wrote appellee, "How is that sweet baby? Darling I hope I can see you and Carolyn Christmas. Am going to get her something. * * * Kiss Carolyn for me and write real often and I will do the same."

On January 3, 1955, he wrote the appellee, ''Had hoped to keep Carolyn out of this but looks like I can't get out any other way. Am going to get a party to tell Thelma (his wife) about Carolyn. Guess she will either quit me or kill me one. * * * Did you get the package I sent Carolyn?'' On January 21, 1955, he wrote appelle, ''Was glad to get your letter this morning and know that Carolyn is some better. * * * Darling, I would give anything to see you and Carolyn. * * * I sat here on the gate and cried this morning thinking about you, Carolyn and Christine (his legitimate daughter), knowing that I love all three of you and always will.'' On January 8, 1955, he wrote appellee that his wife knew about Carolyn but had not mentioned it to him, but that as soon as he can get nerve enough he is going to bring it up to her and try to get her to agree to a divorce. He also said, ''As for Carolyn, I know she is as much mine as Christine, and you know how much I love her. So you see both of those children are in my heart and on my mind every day and night that comes. Darling, I want to see you and Carolyn so bad. If you will come down one weekend I will send the money to make the trip.''

On August 15, 1954, which is the very day when Carolyn was born, he wrote the appellee a long letter and said, ''Sure be glad when it is over as I am sure worried about you. Hope everything is O. K. Take care of yourself and write every day.'' On August 16, 1954, before he learned of the birth of Carolyn, he wrote appellee, ''Received a letter from you today, was hoping everything was over.'' He also said that he would see her the following Saturday. On November 1, 1954, he wrote her, ''Darling, I do hope I can see you and Carolyn when you come down here. I love you Darling as much as you love me, even if you doubt it.'' On November 25, 1954, after appellee had moved to Ackerman, he wrote her, ''I love you so much and do hope that you come back close enough that I can see you and Carolyn once in a while.

\* \* \* I sure did enjoy reading about Carolyn eating, wish I could have seen her. Sure be glad when you get some pictures of her.''

On November 20, 1954, he wrote her ''Was so glad to get the letter and card from you and Carolyn. Sure sorry about Carolyn being so sick. Let me know at once if she is O. K. Darling I was so glad to see you last Sunday but I wish it was tomorrow so I would have that to look forward to. It sure does hurt for you and Carolyn to be so far away. Wish you would try and come to Jackson so I could see you more often.'' On November 24, 1954, he wrote her, ''Was so glad to hear that Carolyn is doing better. Hope she is O. K.'' On December 18, 1954, he wrote, ''Got your letter today and was so glad to get the pictures. I wouldn't take anything for them. She looks so sweet. \* \* \* I am going to get something Monday for Carolyn and send it. \* \* \* Kiss the baby for me.'' On September 20, 1954, he wrote, ''I sure do like the pictures. Send me some often.'' On December 3, 1954, he wrote, ''Sure was glad to get the picture.'' On February 5, 1955, he wrote, ''Sure have worried about Carolyn since I got your letter. Hate to think about her having to suffer with such a cold. \* \* \* Let me hear from you and Carolyn soon. Hug and kiss her a few extra times for me.'' On February 23, 1955, he wrote appellee a letter and closed it with, ''Kiss Carolyn for me.'' On February 28, 1955, he wrote her a love letter and closed it with ''Let me hear from you and Carolyn often.'' On March 22, 1955, he wrote, among other things, ''Sure would like to see Carolyn with all those teeth.'' On January 24, 1955, he wrote a long letter and concluded with ''Kiss Carolyn for me.'' On January 16, 1955, he wrote, ''Got your letter last night, was so glad to hear from you but was sure sorry about Carolyn being sick. \* \* \* Carolyn must know me as her daddy as soon as she is big enough or not know me at all. \* \* \* Answer this at once and let me know how Carolyn is.'' On August 4,

year not given, he concluded a letter to her, "Kiss the baby for me."

We have referred to these letters in the order in which they appear in the record instead of in chronological order.

The appellant was called as an adverse witness for cross examination and he admitted writing each and every one of the letters above referred to. About the middle of the cross examination he said, "Those letters are not notarized and I can lie any lie I want to." In final explanation of these letters he said that the appellee had him fooled by telling him that the child was a seven and one-half months baby before the hearing, but at the hearing in the justice of the peace court she testified that she had become pregnant between October 15th and November 15th, 1953. He did not deny intimate relations with her during that time but said that during that time he was taking protective measures. He did not explain what those measures were nor whether they were effective.

The sheriff of Warren County testified that the appellant called his home and said he was in trouble and wanted to talk with him and come to his home and told him that Miss Cook was in her car with the baby sitting near or in front of his house and he was afraid she would kill him. The sheriff also said that the appellant told him that he was guilty of being the father of the child.

■■ We are of the opinion that there was no substantial dispute raising an issue of fact in this case for decision by a jury and that trial court was eminently correct in granting the peremptory instruction in favor of the appellee. Such facts as were in dispute were on wholly immaterial matters and were not sufficient to carry the case to the jury.

■■ The appellant next contends that in a bastardy proceeding the defendant's earning capacity must be shown as a basis for the damages assessed, and appellant further contends that there was no evidence whatsoever

as to the defendant's earning capacity. The record shows that the appellant had formerly been a member of the Vicksburg police force but he had left that position and on January 3, 1955, he wrote the appellee, "I am day guard up at the plant now. From 8 in the morning till 4 in the afternoon. Make $318.00 per month."

In the case of Daughdrill v. Hathorn, 160 Miss. 291, 133 So. 131, 74 A. L. R. 761, this Court said:

"We think it was error for the court to admit evidence of the debts of the appellee, Hathorn, in this proceeding, and that it was error to instruct the jury that they should take into consideration his ability to pay, etc., as stated in said instruction. The primary object of the proceeding is to secure the support and education of the child for a period of not more than eighteen years. The ability of the father to pay his debts is not a criterion by which this amount shall be determined. The only pertinent fact is his ability to earn, coupled with his property. The child must be supported and educated according to the requirements and standards of ordinary living in the community in which it is to be supported and educated. A child handicapped socially and in business by the stigma of bastardy ought not to be unduly restricted in its standard of living and education. It is entitled to have the benefits of an ordinary support and education such as other children usually receive to meet the requirements of life. * * * He who has danced should pay the fiddler, and the law requires the father of the bastard child to support and educate it for such period of time until the child will become able to support and maintain itself."

█ █ The appellant also complains that the insructions on the measure of damages and the form of the verdict were erroneous. The instruction on the measure of damages is taken from Section 1077 of Alexander's Mississippi Jury Instructions and is also fully supported by what we have just quoted from the case of Daughdrill v. Hathorn. The instruction on the form of the verdict is as follows: "The court instructs the jury for the plain-

tiff that your verdict may be in the following form, to-wit: 'We, the Jury, find for the plaintiff and assess her damages at $_____ for the support and maintenance of the child to this date, and the additional amount of $_____ per _____ (Month, Quarter or Annum) from this date until said child shall reach the age of 18 years.' "

Section 392, Code of 1942, provides in part as follows: "If the jury shall find for the complainant, it may assess such damages as it may think proper in her favor, or in favor of the child if the mother be dead, and may direct the same to be paid annually or otherwise for any term of years, not exceeding eighteen, and the court shall render judgment accordingly." It will be noted that the instruction in question is not peremptory in its nature. It merely permits the jury to return a verdict in that form if they desired to do so. It is true that the jury were not compelled by this instruction to find a verdict in the form set out but was only told that they might use that form. If the appellant had desired any other or further instruction on the subject, he should have requested the same. We have frequently had occasion to deal with this question in cases involving the comparative negligence statute and one of the most recent is Mason v. United Gas Corp., 222 Miss. 311, 75 So. 2d 736, wherein we said:

"We have carefully considered the assignments presented by the appellant and are of the opinion that none of them possess merit with the exception of the assignment that the trial court erred in refusing the appellant's request for the following instruction:

" 'The court instructs the jury for the plaintiff that in all actions brought for recovery of damages for personal injuries, the fact that the person injured may have been guilty of contributory negligence shall not bar a recovery.'

"This instruction was proper and should have been granted. Illinois Central Railroad Co., et al v. Archer,

113 Miss. 158, 74 So. 135; Alexander's Mississippi Jury Instructions, Sec. 3499. A notation by the trial judge on the refused instruction indicates that he refused it upon the ground that it contained no direction for diminishing damages in accordance with the provision of Sec. 1454 of the Mississippi Code of 1942. The requested instruction, however, did not preclude the jury from diminishing damages in accordnace with the statute, and the appellant was not required to incorporate in the requested instruction a direction for the diminishment of damages in accordance with the provisons of the statute. If the appellee had desired to avail itself of the statutory right to have the damages diminished in proportion to the negligence, if any, of the appellant, it was its duty to request the court to so instruct the jury. Morrell Packing Company et al v. Branning, 155 Miss. 376, 124 So. 356. The refusal of the instruction was clearly prejudicial to the appellant, particularly in view of the instruction granted to the appellee as to the effect of the negligence, if any, of the appellant.

"The refusal of this instruction, in our opinion, constitutes reversible error. It follows, therefore, that the judgment of the court below must be, and it is, reversed and the cause remanded."

■■■ Under this heading the appellant also complains of a statement of the trial judge to counsel for the appellant. The appellee was testifying as a witness in her own behalf when the following occurred, as shown by the record:

"Q. Will you give us your idea of the expenses you will incur in the future for the support of the child?
BY MR. PREWITT:
As for future expenses, I think past expenses would be the criteria.
"BY THE COURT:
I didn't hear the objection.

BY MR. PREWITT:

I said that as to future expenses, that would be conjectural.

BY THE COURT:

The law says up to the time the child is 18 years old.

BY MR. PREWITT:

But it cannot be conjectural.

BY THE COURT:

No, it cannot be conjectural, but you can ask, if you call that conjectural. The objection is overruled.'' It will be noted that the statement of the court was directed to counsel for appellant, but he says that it is tantamount to an oral instruction in violation of Section 1530, Code of 1942.

In the case of Price v. State, 207 Miss. 111, 41 So. 2d 37, we quoted with approval from the case of Bumpus v. State, 166 Miss. 276, 144 So. 897, 899, as follows: '' 'In passing, we will say that the statute invoked does not place the judge in a strait-jacket nor prevent him from having anything to say during the progress of a trial. Of course, he should keep off of the province of the jury, and not try to influence their verdict; and while it may be safer for him to rule without giving his reasons therefor, he has the right to give such reasons if he so desires, and to show why, in his opinion, the reasons advanced for a contrary ruling are unsound. In so doing, he may go too far and transgress the proprieties; but such is not the case here.

'' 'It is true that ''an overspeaking judge is no well-tuned cymbal'', but, in language some what similar to that of Mr. Justice McReynolds, in Berger v. United States, 255 U. S. (22) 43, 41 S. Ct. 230, 65 L. Ed. (481), 489, neither is an aphonic dummy a becoming receptacle for judicial power.' '' We do not think that the statement of the judge to appellant's counsel was an oral instruction to the jury in violation of the statute.

This case is aptly covered by what was said in Graves v. Gambrell, 184 Miss. 61, 185 So. 238, as follows: "Placing the evidence in this case in the class of probability, it seems to us that it is sufficient to establish the fatherhood of the child in the appellee—even beyond reasonable doubt. There is no other reasonable deduction, it seems to us, to be drawn from all the facts. The defendant himself admitted the relationship, and produced no proof which would reasonably indicate another as the father of the child. Instead of lending plaintiff his name after causing her ruin, he married another without waiting to see the result of his act. Where one seeks to enjoy single blessedness and connubial bliss, the result may be disastrous —as in this case. The child, innocent of wrongdoing, is brought into the world handicapped by disabilities under the law, and clothed in the garments of shame. A woman apparently of previous good reputation has been degraded and humiliated. She receives the scorn of the upright, the jeers of the thoughtless, and the leers of the lascivious. One of the inhumanities of the law, coming down from remote ages, is the fastening upon the innocent child the disabilities of bastardy, because of which it cannot inherit from the father, or through his blood from any of his relatives, and the child must suffer all the social and legal handicaps that flow from the wrong of its parents, without any fault on its part. It is deprived of the means of physical comfort that money would buy, and of the advice and fatherly love a child so greatly needs. There should be a sterner justice in the law on this subject. Surely, somewhere in the volumes of the law there should be some chosen curse, some hidden thunder red with uncommon wrath, to blast the hopes of him who seeks pleasure in a maiden's ruin."

The judgment of the lower court is accodingly affirmed.

Affirmed.

*McGehee, C. J.,* and *Lee, Holmes* and *Arrington,* JJ., concur.