774 So.2d 476 (2000)
Larry WOMACK, Appellant,
v.
STATE of Mississippi, Appellee.
No. 1999-KA-01246-COA.
Court of Appeals of Mississippi.
September 5, 2000.
Rehearing Denied October 24, 2000.
Certiorari Denied December 21, 2000.
*478 Dan W. Duggan, Jr., Brandon, Vicki L. Gilliam, Jackson, Attorneys for Appellant.
Office of the Attorney General by Deirdre McCrory, Attorney for Appellee.
BEFORE KING, P.J., LEE, AND MYERS, JJ.
LEE, J., for the Court:
¶ 1. Larry Womack was convicted for the crime of murder. Feeling aggrieved by the decision of the jury, Womack has filed a timely appeal. Womack asserts the following issues: (1) whether the trial court erred when it denied Womack's motion for directed verdict, motion for judgment notwithstanding the verdict, and in finding that the verdict was not against the overwhelming weight of the evidence, and (2) whether the trial court erred by granting the State's motion in limine which prevented Womack from introducing the verdict of manslaughter rendered by the jury against the co-defendant in a separate case. Finding these issues without merit, we affirm the decision of the lower court.

FACTS
¶ 2. The evidence presented in the case revealed that Larry Womack and Onealius Sheppard were involved in the shooting of Emanuel Fox. However, some of the circumstances that prompted the shooting of Emanuel were in dispute.
¶ 3. It is undisputed that Emanuel Fox's death resulted from a gun shot wound created by a .380 caliber bullet. The testimony of Sheppard revealed that he possessed the .38 firearm and that it had been concealed prior to the shooting. Sheppard admitted to aiming and firing the gun in the direction of Emanuel and his brother, John Fox, Jr. The testimony also revealed that Womack possessed a concealed .38 revolver containing wad cutters, and he had fired this gun at least once in the direction of Emanuel's house. The major issues that were in dispute were the facts pertaining to a struggle that occurred between Womack and Emanuel prior to Emanuel's shooting and whether a firearm was possessed by Emanuel or his brother, John Fox, Jr. immediately preceding the shooting and death of Emanuel. The testimony of the witnesses will be discussed in issue one.

DISCUSSION

I. WHETHER THE TRIAL COURT ERRED WHEN IT DENIED WOMACK'S MOTION FOR DIRECTED VERDICT, MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT, AND IN FINDING THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 4. Womack contends that the State failed to prove beyond a reasonable doubt the deliberate design element for the crime of murder. Instead, Womack *479 states that if found guilty at all, he should be found guilty of manslaughter, either under the theory that the killing occurred during the commission of a misdemeanor (i.e., carrying a concealed weapon) pursuant to Miss.Code Ann. § 97-3-29 (Rev. 1994), or the theory of self-defense under Miss.Code Ann. § 97-3-31 (Rev.1994). In turn, Womack argues that the trial judge erred when he denied his motion for directed verdict and motion for judgment notwithstanding the verdict. Womack also argues that the verdict of the jury was against the overwhelming weight of the evidence. This Court will first recount the testimony given at trial and examine the contention that the trial judge erred when he failed to grant a directed verdict or judgment notwithstanding the verdict. We will review these arguments and the facts in light of the instructions given to the jury and the law which states that when an individual aids and abets another while that individual is committing a crime he or she may be convicted and sentenced as the principal. Stevenson v. State, 738 So.2d 1248 (¶ 11) (Miss.Ct.App.1999).
¶ 5. The first witness that was called by the State to testify was Shirley Fox, Emanuel's mother. Shirley Fox testified that she had arrived at home from the casino around twelve o' clock midnight. Shirley lived next to Emanuel. Shirley told the jury that she walked next door to talk to her son Emanuel and inform him that she had won some money. Shirley explained that when she arrived at Emanuel's house he was in bed and was asleep. After she had spoken with Emanuel, Shirley stated she went back to her apartment and shortly thereafter went next door. While Shirley was next door she heard loud talking coming from the direction of the front lawn. Shirley proceeded to go outside and claimed she witnessed Emanuel standing on a green and black automobile and two males standing on the porch. Shirley instructed Emanuel to go inside the house and directed the other two males to go home. Shirley further testified that she did not witness a tussle or a scuffle between Emanuel and the two males. Thereafter, Shirley walked back into her house, at which time she heard gunshots. Shirley immediately ran back outside where she saw Emanuel lying on the ground shot. Additionally, Shirley testified that her other son, John, Jr. was present at Emanuel's; however, prior to the shooting she was unaware of his presence. Shirley testified that she had not had the opportunity to see any firearms or other weapons in Emanuel's hands. Additionally, she stated that at the time she saw John, Jr. he was not in possession of a gun. Shirley claimed that she had never seen a shotgun in Emanuel's duplex. Shirley explained that she had heard about three gunshots prior to discovering that Emanuel had been shot. The second witness for the State was Officer Terry Dismukes.
¶ 6. Officer Dismukes testified that he had arrived at the scene of Emanuel's shooting and interviewed John, Jr. The officer admitted that at the time he interviewed John, Jr., John appeared emotional and distraught. The officer's testimony was as follows:
He told us that he was in the back. When he heard a knock at the door, he walked up to the front. His brother, Emanuel, answered the door. At that time it was an individual by the name of Tiger (a.k.a. Larry) Womack at the door, along with another black male whom he did not know. He didn't hear the conversation, but the next thing he know [sic] Tiger Womack fired a shot.
Additionally, John, Jr. had informed Officer Dismukes that Womack and the other male were in a blue, older model Cadillac. Officer Dismukes testified that he did not see any guns inside the house; however, Officer Hutchins had found what appeared to be marijuana in the bedroom. The next witness called by the State was John Fox, Jr.
¶ 7. John, Jr. testified that he was present at the time his brother Emanuel was *480 shot. John, Jr. stated that the incident occurred about 1:30 a.m. John, Jr. explained that he was asleep on the couch when he heard Emanuel call his name. Upon hearing his name he left his position on the couch and proceeded toward Emanuel.
¶ 8. At this time, John, Jr. observed Emanuel and Womack grasping each other. John, Jr. was not sure if they were struggling with each other; nonetheless, he did not witness Emanuel or Womack striking each other. John, Jr. said that Emanuel and Womack were holding each other by the arm, and that by the time he had moved off the couch and made it to the door, Womack had "broke a loose" and jumped off the porch backwards. Thereafter, Womack pulled his firearm.
¶ 9. John, Jr. explained that not only was Womack present, but there was another black individual standing on the lawn; however, it was not until later that he found out that this person was Sheppard. When Womack left the porch he was facing straight toward the house and was two or three feet from where Sheppard was located. Next, Womack "pulled up a gun and he shot." Thereafter, John, Jr. pushed Emanuel back into the house. As John, Jr. was getting ready to run out the door, he tripped and fell in the doorway and there were two more shots fired. John, Jr. testified that both Womack and Sheppard possessed guns, and there were shots fired by each individual from each gun towards him and Emanuel. Additionally, John, Jr. testified that neither him nor Emanuel had a gun and that to his knowledge none were in Emanuel's house.
¶ 10. John, Jr. claimed that after the shots were fired, Womack and Sheppard fled from the house and got in a blue Cadillac which John, Jr. identified as belonging to Womack. John, Jr. stated that the automobile was parked on the next street. After John, Jr. witnessed Womack and Sheppard drive away he went back to Emanuel's house and discovered that Emanuel had been shot.
¶ 11. John, Jr. also testified that the gunshots fired toward the house caused damage to the house. The testimony from Sergeant Grant Parker supported John, Jr.'s testimony regarding the fact that the bullets were shot toward the house. Additionally, Parker testified that a .380 shell casing was recovered from the scene. Furthermore, Parker testified that a search warrant had been executed to perform searches at previous dwellings where Womack had resided.
¶ 12. The searches revealed several .38 caliber bullets which were the type to be shot in a revolver firearm. Some of the.38 caliber bullets which were found were wad cutters. The testimony described the bullets as being both live and spent. Additionally, a .38 caliber handgun was recovered from the residence of Womack's mother. This gun was entered into evidence at the trial and John, Jr. stated that it looked similar to the gun he witnessed Womack pull on the night of Emanuel's shooting. The State's next witness was Michael Childress with the crime scene unit of the Jackson Police Department.
¶ 13. Childress's testimony was consistent with others regarding the location of the bullet holes and the direction in which the shots had been fired. Additionally, Childress explained that an examination of the scene disclosed that the bullet holes were fresh. Furthermore, Childress testified that he did not see any evidence that indicated to him that a shotgun or rifle had been fired or was present at the scene. The State concluded its presentation of its evidence by presenting the testimony of John Dial.
¶ 14. Mr. Dial was tendered by the State as an expert in the field of firearms examination and comparison. Dial explained that he was furnished with bullets to analyze which were gathered by officers in relation to this case which he later examined. Dial stated that he was given a .38 caliber cartridge which had been recovered from the scene and it was consistent with a *481 .38 Smith and Wesson, such as the gun produced as Exhibit 20 which belonged to Womack. Additionally, he testified that he examined a .380 automatic cartridge case which was recovered from the scene and was consistent with the type of bullet removed from Emanuel's body.
¶ 15. At the close of the State's case-in-chief, Womack called witnesses to testify on his behalf. The first witness presented to the jury by Womack was Antionette Womack. Antionette Womack was Womack's sister-in-law. Antionette testified that prior to Emanuel's shooting she had lived at Emanuel's house but that she had not been at Emanuel's on the night of his shooting. She related to the jury that in fact she had not been there for at least two weeks prior to Emanuel's shooting because she had gone home to be with her children.
¶ 16. Antionette disputed the testimony of Shirley Fox and John, Jr. and claimed that neither Emanuel nor John, Jr. were employed. Instead, Antionette contended that Emanuel and John, Jr. sold marijuana and claimed she frequently used marijuana with them. Additionally, Antionette alleged that she had seen a long gun in the closet of the second room of Emanuel's apartment. However, on cross-examination, Antionette admitted that she had no personal knowledge of what was in the house on September the 1st or the 2nd when Emanuel was shot. As a final witness, Womack called his co-defendant, Sheppard.
¶ 17. Sheppard was not only a co-defendant, but was also Womack's cousin. Sheppard reflected on the fact that one week earlier he and Womack had seen Emanuel and John, Jr. at a store named Car-Car located on Terry Road. Sheppard contended that Womack asked one of them if they had stated they were going to kill him, and Emanuel replied, "No, somebody just telling stories.... It ain't even like that." Sheppard explained that on the day Emanuel was shot he and Womack had been at their grandmother's house and had decided to purchase marijuana. They went to Emanuel's hoping to acquire the marijuana. The following was Sheppard's testimony regarding his version of the events that took place at Emanuel's house prior to Emanuel's shooting.
So when we go over there to buy the weed, he told us it is dead, he said "It's dead. Don't worry about it." So we go over there to buy the weed. I am sitting outside on the car. The oldest brother, see, he had a car it was on flat or something, something was wrong with it. I was sitting on the car. Larry was sitting on the porch. Emanuel was sitting on the porch. So they talking about this here ... And Larry said he going to go on get the weed.
So Emanuel Fox, he called Larry to the house. So when Larry get into the house, I can't see in the house because I am sitting on the car. The car on the if you walk into the door, it's on the right. It was on the right-hand side of the door.
So by the time Larry get in the house, I am still sitting on the car. So I sat there for like three or four minutes. So by that time I see Larry trying to break up out the door. So when Larry come trying to come out the door, that is when Emanuel Fox, he reached and grabbed Larry trying to keep Larry from coming out the door. Larry yelled at me. I am still sitting o[n] the car. Larry yelled at me, and he said, "He got a gun ..." But Larry say, "He got a gun."
So when Larry say, "He got a gun," the first thing, I say, you know, they already, you know, in our neighborhood they already say out of all the Fox boys John, Jr. the one to do something. So first thing I said, John Jr. fixing to shoot my little cousin. So I jump off the car and run up there on the step. I grabbed Larry by his arm because Emanuel had him and holding him. I run on the porch and grab Larry, snatch him, you know, snatched him from Emanuel. So when I snatched him from Emanuel, I am saying to myself, I feel, *482 you know, I feel like the only reason John, Jr. didn't shoot that gun was because Larry was standinghe [had] some kind of rifle, 12-gauge, or something. I am saying to myself if he shoot that gun and his brother standing there with Larry, he fixing to shoot both of them.
So Larry got to hurry upand when he get away from his brother, he got to hurry up and move. So Larry jumped off the porch, and when he jumped off the porch, he run behind me. when he run behind me, I turned around. I said, we running with our backs turned, so I said, we keep running and give him a chance to get to that front door, he going to shoot one of us in our back. So I turned around and fired two shots. I turned around and fired two shots, that's when me and Larry kept running. Larry fired one shot. So by that time we ran to the car. So we got to the car, we left and went back to our grandmother's house. And that was it.
Sheppard testified that there was no female present and that he did not recall actually seeing John Fox or Emanuel's mother.
¶ 18. On cross-examination, Sheppard admitted that he did not see either John, Jr. or Emanuel in possession of a firearm, and in fact he had not even seen John, Jr. until he was down the street. The record further revealed that the following question was asked of Womack, "Did you yell out that he had a gun?", and the reply was "No, sir. I just told him to watch out, Onealius." Later, in Sheppard's testimony his report to the police was discussed.
¶ 19. Although Sheppard testified that partial contents of the report were a lie, the record reflects that he had stated the following:
The night of the shooting Larry and I went over to the Foxes house on Barrett Street to buy some weed. Larry, Emanuel, and myself were sitting outside talking about the weed that had been stolen from the Foxes. Emanuel was telling Larry that they knew he had not stolen the weed. Emanuel yelled to John Fox, Jr. who was in another room of the house that `here is Tiger,' Tiger being Larry Womack. John Fox, Jr. came out of another room and ran toward Larry, who was standing just inside the front door next to Emanuel. As John Fox, Jr. got close to Larry, Larry pulled out a chrome .38 caliber revolver from his front pocket. John Fox, Jr., Emanuel and Larry began tussling, so I fired two shots up in the air from a .380 caliber automatic which was blue steel. I then turned and started running toward the car which was parked on the next street corner east of the Foxes' house when I heard another shot behind me."
Once again, Sheppard admitted that he did not fire the .380 in the air, but had aimed it at the front door toward John Fox. Sheppard also testified that they fled in Womack's blue Cadillac which they had parked across and down the street from Emanuel's. With all of these facts in mind, we will now look to the applicable law.
¶ 20. "Requests for a directed verdict and motions JNOV implicate sufficiency of the evidence." Franklin v. State, 676 So.2d 287, 288 (Miss.1996). When the trial court judges the legal sufficiency, as opposed to the weight of the evidence on a motion for a directed verdict, the trial court is required to consider evidence introduced in the light most favorable to the State and accept as true all of the evidence introduced at trial by the State, including all reasonable inferences that may be drawn therefrom. Yates v. State, 685 So.2d 715, 718 (Miss.1996). Any evidence that is favorable to the defendant must be disregarded during the consideration of the trial court in determining whether to grant a motion. Id. at 718.
¶ 21. When the court is making a determination on whether to grant a judgment notwithstanding the verdict, the *483 court is "not at liberty to direct that the defendant be discharged short of a conclusion... that given the evidence, taken in the light most favorable to the verdict, no reasonable hypothetical juror could find beyond a reasonable doubt that the defendant was guilty." Hicks v. State, 580 So.2d 1302, 1304-05 (Miss.1991) (quoting Pearson v. State, 428 So.2d 1361, 1364 (Miss.1983)). Additionally, in Hicks v. State, 580 So.2d 1302, 1305 (Miss.1991), the Mississippi Supreme Court quoted from McFee v. State, 511 So.2d 130, 133-34 (Miss.1987), to repeat the standard which we as an appellate court are to apply in resolving the issue of whether the evidence is sufficient to sustain the jury's verdict:
When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidencenot just that supporting the case for the prosecutionin the light most consistent with the verdict. We give the prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb. (citations omitted).
This Court accepts the evidence in the light most favorable to the State and determines there was sufficient evidence presented through the testimony of the witnesses to support the State's theory and allow the jury to decide if Womack was guilty as charged for murder. In Gossett v. State, 660 So.2d 1285, 1293 (Miss.1995), deliberate design was once again defined as follows:
Deliberate always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. "Design" means to calculate, plan, contemplate... deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent.
The testimony showed that Womack and Sheppard had parked up the street from Emanuel's and had arrived carrying concealed weapons. Furthermore, the testimony revealed that Womack and Sheppard intentionally fired their weapons at John, Jr. and Emanuel after Womack had left Emanuel's reach and without seeing evidence that John, Jr. or Emanuel were armed. The evidence was sufficient to prove that Sheppard had the intent necessary for murder. The aforementioned evidence showed that it was Womack and the victim that were in the alleged confrontation, while Sheppard was nearby. The evidence showed that Sheppard had sufficient time to form the requisite intent for the crime of murder. Additionally, since Womack was actively involved in the commission of the crime committed by Sheppard he may be convicted and sentenced as a principal; therefore, Womack could be found guilty of murder. The jury was not only instructed regarding the elements of murder but was also given two instructions for the elements of manslaughter as it pertains to self-defense and a death that occurs during the commission of a misdemeanor. Therefore, this argument is without merit.
¶ 22. Womack further contends that the trial court erred when it did not grant him a new trial because the verdict of the jury was against the overwhelming weight of the evidence. In Benson v. State, 551 So.2d 188, 193 (Miss.1989), the Mississippi Supreme Court provided the *484 following explanation of when it would grant a new trial:
This Court will not order a new trial "unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." Groseclose v. State, 440 So.2d 297, 300 (Miss.1983). Factual disputes are properly resolved by the jury and do not mandate a new trial. Temple v. State, 498 So.2d 379, 382 (Miss. 1986).
A motion for a new trial is within the sound discretion of the trial court. Burge v. State, 472 So.2d 392, 397 (Miss.1985). This Court notes that while there was testimony which was given by witnesses that gave different versions of the night's events, the jury is the sole judge of the credibility of witnesses. Jowers v. State, 593 So.2d 46, 47 (Miss.1992); Dixon v. State, 519 So.2d 1226, 1228 (Miss.1988). A trial judge can take the case from the jury only where there is no testimony that would warrant the jury, if the witness were believed, in finding a guilty verdict. Price v. State, 207 Miss. 111, 41 So.2d 37, 40 (1949). The question of whether there was a physical confrontation that occurred between Emanuel and Womack, and if so who instigated it, as well as its severity, whether it began before or after Womack pulled his revolver, and whether Emanuel and John, Jr. possessed firearms were issues of fact to be resolved by the jury. In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court accepts as true all evidence which supports the verdict and will reverse only when convinced that the trial court has abused its discretion in failing to grant a new trial. Id.
¶ 23. It must be kept in mind that any discrepancies were properly resolved by the jury as fact finder because questions regarding weight and worth of witness testimony or witness credibility are for the jury to settle. Eakes v. State, 665 So.2d 852, 872 (Miss.1995). The evidence and any factual disputes that existed were accordingly resolved against Womack. Therefore, there was no abuse of discretion on behalf of the trial judge and these issues are without merit. We affirm the lower court.

II. WHETHER THE TRIAL COURT ERRED BY GRANTING THE STATE'S MOTION IN LIMINE WHICH PREVENTED WOMACK FROM INTRODUCING THE VERDICT OF MANSLAUGHTER RENDERED BY THE JURY AGAINST THE CO-DEFENDANT IN A SEPARATE CASE.
¶ 24. Womack argues that he was denied his constitutional right to present his theory of the case, when the trial court granted the State's motion in limine because it prevented the co-defendant Sheppard from testifying that a prior jury had convicted him of manslaughter for his involvement in Emanuel's shooting. Womack asserts that since the Mississippi Supreme Court has on a limited basis accepted the admission of a co-defendant's guilty plea at trial, he should have been allowed to admit a previous jury verdict of a co-defendant. The State counters this argument by asserting that the fact that another jury convicted the co-defendant Sheppard of manslaughter is irrelevant to the question of whether Womack was guilty of murder, manslaughter, or not guilty.
¶ 25. The trial court is predominately vested with the discretion to decide whether evidence is relevant and admissible. White v. State, 742 So.2d 1126 (¶ 29) (Miss.1999). This Court will only reverse when there has been an abuse of discretion which results in prejudice to the accused. Id. Applying this standard of review we will first address Womack's argument relative to whether he was denied his right to present his theory of the case.
¶ 26. Womack begins this argument by declaring that "it is well settled law of this State that a defendant has a fundamental right to present his theories *485 of the defense to the trial jury no matter how meager the evidence may be in support thereof or no matter how unlikely the evidence may be." McMillan v. City of Jackson, 701 So.2d 1105 (¶ 13) (Miss.1997); (citing Russell v. State, 729 So.2d 781, 788 (Miss.1997) (accused was limited in presenting evidence relative to his theories of insanity); Manuel v. State, 667 So.2d 590, 593 (Miss.1995) (trial court should have instructed the jury of the theory of justification, defense, or excuse if supported by the evidence, even if the evidence is meagerstory of events that lead to killing differed from those presented by state and supported a theory of justification); Craig v. State, 660 So.2d 1298, 1300 (Miss.1995) (entitled to proper jury instruction on theory of self-defense where evidence supports such a claim); Giles v. State, 650 So.2d 846, 848-50 (Miss.1995) (error not to instruct the jury that accused could not be convicted of the capital murder of his wife while in the course of sexual battery if defendant and his spouse were not separated and living apart, when defendant's only theory of defense was that he purposely did not live with his wife so he could obtain welfare benefits; therefore, he could not be found guilty of the crime of sexual battery because they were not living separate and apart); Lacy v. State, 629 So.2d 591, 593-94 (Miss.1993) (defense counsel is entitled to cross-examine a witness to prove that the witness initially refused to talk with him or her in order to show bias); Green v. State, 614 So.2d 926, 934-35 (Miss.1993) (evidence regarding the victim's propensity for violence should have been admitted in capital murder trial, since the accused asserted self-defense, and offered evidence of victim's initial overt act of violence)). Womack also cited the cases of Alexander v. State, 610 So.2d 320 (Miss.1992); Hester v. State, 602 So.2d 869 (Miss.1992), Myers v. State, 296 So.2d 695 (Miss.1974); and Crapps v. State, 221 So.2d 722 (Miss.1969) which essentially assert the same aforementioned contentions of law. While this Court agrees that Womack is entitled to present his theory of the events surrounding the actual shooting of Emanuel in an attempt to provide a defense, this Court declines the invitation to hold that a co-defendant's prior conviction of manslaughter constitutes a "theory". Instead as opposed to the numerous cases listed above that were cited by Womack, the previous conviction is an outside, irrelevant fact that would merely be used to influence the jury when returning a verdict. Therefore, we find no abuse of discretion occurred on the part of the trial judge. Having resolved this argument, we will now address Womack's second assertion regarding the admission of guilty pleas, where he argues that if evidence of a co-defendant's guilty plea has been allowed this Court should allow the admission of Womack's co-defendant's prior conviction of manslaughter for the shooting of Emanuel.
¶ 27. In White v. State, 616 So.2d 304, 307 (Miss.1993), the Mississippi Supreme Court stated that the admission into evidence of a co-defendant's guilty plea may be harmless if it were used for such purposes as attacking the witnesses credibility of the co-defendant; however, the court acknowledged the it was still inadmissible as substantive evidence to indicate the guilt of the defendant. Again, in Palm v. State, 748 So.2d 135 (¶ 15) (Miss.1999), the Mississippi Supreme Court recognized that it is improper to introduce an accomplice's conviction of the same crime for which the defendant is being tried. This is so because a conviction by a separate tribunal is not synonymous with a guilty plea. Id. at (¶ 16). In White, 616 So.2d at 307, the Mississippi Supreme Court explained the dangers of allowing the admission into evidence of the jury verdict of a co-defendant:
In four of the cases relied upon, Ivy, Johns, Henderson, and Griffin, the witness had been tried by a jury and found guilty of the same crime for which the defendant was being tried. The danger at issue in these cases is that one jury would rely upon the judgment of a prior jury in reaching its decision. These *486 cases are distinguishable, however, because we are dealing with a plea of guilty in the instant case; that is, a prior admission of guilt, which is consistent with the testimony at trial. This is a significant distinction because prior statements have evidentiary value different from prior findings of other tribunals.
We find that the same law applies to Womack's argument. Womack does not get the benefit of applying it in the inverse just because he hopes it will result in the return of a more positive verdict. Therefore, this argument fails. We find this issue to be without merit, accordingly, we affirm the decision of the trial court.
¶ 28. THE JUDGMENT OF THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, IRVING, MOORE, MYERS, PAYNE, AND THOMAS, JJ., CONCUR.