915 So.2d 468 (2005)
Sammy COLEMAN a/k/a Sammy Dean Coleman, Appellant
v.
STATE of Mississippi, Appellee.
No. 2003-KA-02401-COA.
Court of Appeals of Mississippi.
May 17, 2005.
Rehearing Denied August 23, 2005.
Certiorari Denied December 1, 2005.
*469 Thomas M. Fortner, Virginia L. Watkins, Jackson, attorneys for appellant.
Office of the Attorney General by Deirdre McCrory, attorney for appellee.
Before LEE, P.J., MYERS and BARNES, JJ.
MYERS, J., for the Court.
¶ 1. On July 30, 2003, a jury in the Circuit Court of Hinds County, Second Judicial District, convicted Sammy Coleman of one count of rape and one count of aggravated assault against D.P. Coleman was charged with three counts of rape, but the jury only convicted him of one of the counts. Coleman had been convicted of two prior felonies; therefore, he was sentenced as an habitual offender and ordered to serve twenty years for the charge of rape and twenty-five years for the charge of aggravated assault in the custody of the Mississippi Department of Corrections, said sentences to run consecutively.
¶ 2. Aggrieved by the judgment of the circuit court, Coleman raises the following four issues on appeal:
I. DID THE TRIAL COURT ERR IN ADMITTING CERTAIN PHOTOGRAPHS THAT WERE NOT PRODUCED IN DISCOVERY?
II. DID THE TRIAL COURT ERR IN DENYING INSTRUCTION D-7, REGARDING THE LESSER-INCLUDED OFFENSE OF SIMPLE ASSAULT?
III. DID THE TRIAL COURT ERR IN DENYING COLEMAN'S MOTION FOR DIRECTED VERDICT?
IV. WAS THE JURY'S VERDICT CONTRARY TO LAW AND AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
¶ 3. Finding no reversible error, we affirm the judgment of the circuit court.

FACTS
¶ 4. While there are a few undisputed facts in this case, the large majority of the facts are disputed by Coleman and D. P., who gave two vastly different accounts of what happened on the night of January 22, 2002, and the early morning hours of January 23, 2003. Given the verdict, the jury apparently credited Coleman's version of the night's events at a few points but ultimately credited D. P.'s version in general as the most reliable and accurate. *470 Thus, we will review the undisputed facts first, and then proceed to review each version of the facts, beginning with D. P.'s.

The undisputed facts
¶ 5. D.P. lived in South Jackson with her boyfriend, M. D., and her adopted daughter. D.P. also had an infant son, and it appears that the son also lived with D. P., although there was some indication that the son may actually have lived with D. P.'s sister. Coleman was an acquaintance of D. P.'s through M. D., but Coleman was not a close friend of D.P. or M.D. On January 22, 2002, Coleman had given M.D. a ride to a local pawn shop so that M.D. could sell his pet ferret, which had apparently become vexatious to D.P.M.D. needed a ride to the pawn shop because the vehicle used by D.P. and M.D. was in the shop being repaired. Coleman was driving a rather small, two-door hatchback.
¶ 6. Coleman and M.D. proceeded to the pawn shop, where the pawn broker took the ferret off M. D.'s hands for an undisclosed sum. When they returned to D.P. and M. D.'s dwelling at around 5:00 p.m., D.P. asked Coleman for a ride to a store around the corner. Coleman agreed, and they left. At this point, the undisputed facts end, and the different versions of the events begin. The different versions continue until D.P. is taken to the hospital, after which there are a few final undisputed facts.

D. P.'s version of events
¶ 7. According to D. P., upon entering the car, Coleman declared that M.D. had made a big mistake by letting D.P. get into the car with him. For some reason, this threatening comment did not alarm D. P.; so, she and Coleman went on their way. D.P. testified that upon entering Coleman's car she was wearing a pair of shorts and a t-shirt and that she was not wearing any undergarments. D.P. also testified that she and Coleman did not engage in any conversation, casual or intimate, during their travels that night. When they reached the store to which D.P. was hoping to go, Coleman did not stop, as D.P. requested, but continued driving. Instead of stopping where D.P. wanted to stop, Coleman proceeded to another store some distance away, near Gallatin Street. At this store, Coleman demanded that D.P. give him some money. She complied, assuming that he was asking for gas money, since he was driving her around on her errands. Coleman entered this store, purchased a beer, and returned to the car, where D.P. waited. At this point, D.P. still did not suspect any foul play or evil designs on the part of Coleman; thus, she did not attempt to flee while Coleman was inside purchasing his beer.
¶ 8. After leaving this store, Coleman told D.P. that he wished to visit a friend in Raymond. D. P., becoming progressively more alarmed, requested that Coleman take her back home. Coleman insisted on going to Raymond to visit his friend, and D. P., still hoping for the best, told herself that Coleman would simply visit his friend and then take her home. They traveled some back roads that D.P. did not recognize and eventually arrived at a house Coleman knew to be abandoned. Coleman left the vehicle to use the restroom, and, upon returning, told D.P. that she must have sexual intercourse with him whether she wanted to or not. She refused and began to struggle and scream. She managed to get free for a brief moment and attempted to flee, but Coleman caught her, beat her into submission, and forced her to return to the car with him. During her failed attempt to flee, she kicked off one of her sandals in order to leave a trail for anyone that might come looking for her. Coleman then forced D.P. to perform oral sex upon him before forcing her to have sexual intercourse with him. While they *471 were back in the car, however, a neighbor came up to the parked car, knocked on the window, and told the occupants that they would have to leave or he would call the police. (It should be noted here that this neighbor testified that he did not hear any screaming nor did he detect any other signs of a struggle between the persons in the car.)
¶ 9. Having only partially consummated his crime, Coleman sped away from the abandoned house and proceeded to another location in Raymond, mercilessly beating down any of D. P.'s attempts to escape or to plead for mercy. The next location to which Coleman took D.P. was a dead end road behind a restaurant near Highway 18 in Raymond. There again, he beat D.P. into submission and again forced her to have sexual intercourse with him in the car. From this location, Coleman proceeded to take D.P. to yet another location, all the while beating her about the head and shoulders in order to silence her protests, prevent her escape, and coerce her submission to his continued evil designs.
¶ 10. The next location to which Coleman took D.P. was a private drive somewhere near Jackson-Raymond Road. After turning down this private drive, Coleman's car became stuck in a ditch, at which point he forced D.P. to exit the car, threatening to cut her throat with his pocket knife if she did not comply. In order to prove his seriousness, he made her feel his pocket to show her that he had a pocket knife and was willing to use it to kill her. He forced her to carry two blankets to a nearby pond, but upon nearing the pond, D.P. refused to go any further, declaring that Coleman would have to kill her before she would allow him to hurt her any further. At that point Coleman hit D.P. over the head with a beer bottle, knocking her unconscious.
¶ 11. Coleman laid atop D.P. and fell asleep for some time, until it began to rain, at which point, Coleman forced D.P. to return to the vehicle with him. Upon returning to the vehicle, Coleman yet again forced D.P. to have sexual intercourse with him. In a final, desperate effort to escape, D.P. pretended to fall asleep in the car. Coleman became convinced that D.P. was actually asleep and eventually fell asleep himself in the driver's seat. As soon as D.P. was sure that Coleman was fully asleep, she grabbed a pair of boots and a vest from the back of the car and fled. She proceeded back to the main road they had left and began to run in the direction of some houses. As she fled she tried unsuccessfully to flag down several approaching cars. Finally, she noticed a house with a cross in the window and, concluding that the residents must be good, Christian people, she approached the house and asked for help.
¶ 12. The residents of this house were, indeed, good people who took D.P. in and offered her help. They gave her some new clothes and some water to drink and then called the police. By this time, it was around 3:00 a.m. Officers from the Jackson Police Department as well as the Hinds County Sheriff's office arrived shortly thereafter and accompanied D.P. back to the location of Coleman's car. Coleman was still asleep in his car at the same location. The police awakened him and took him into custody on charges of rape and assault.

Coleman's version of events
¶ 13. According to Coleman, however, the events were decidedly different. Coleman testified that D.P. was wearing a t-shirt and long pants when she entered his car, and he maintained that after he and D.P. left her house, she told him that she was meeting her sister at the nearby store in order to obtain crack cocaine from her. *472 When they passed by the store, D.P. saw no sign of her sister and, because of this, asked Coleman if he would take her to try to find drugs from some other source. In pursuit of this objective, Coleman headed in the direction of downtown, stopping for a brief time at a store near Gallatin street in order to purchase a beer. Coleman declared that he purchased the beer with his own money and denied that he had received any money from D.P. While they were traveling, Coleman alleged that D.P. confided in him concerning the loss of love in her relationship with M. D., their plan to split up as soon as M.D. received some money from an expected lawsuit settlement, and the problems she was having with her adopted daughter, who had been, of late, sneaking off to see boys. She then began to come on to him by, among other things, putting her hand on his leg.
¶ 14. According to Coleman, they drove to the abandoned house in Raymond for the purpose of having a secluded, private spot in which to engage in consensual sexual activity. When they arrived at the house, Coleman alleges that it was D.P. who exited the vehicle in order to go to the restroom and that, while she was outside of the vehicle, she accidentally lost one of her sandals. They both attempted to find the sandal, but to no avail. Upon re-entering the car, D.P. began, voluntarily, to perform oral sex upon Coleman, and things were proceeding in the direction of sexual intercourse when they were interrupted by the neighbor demanding that they leave or answer to the police. The neighbor testified that he could not see into the vehicle, because the windows were fogged up; thus, he could not say who was in the vehicle or what they were doing there.
¶ 15. At that point they left and headed back towards town. Upon passing a restaurant near Highway 18 in Raymond, they decided to drive by and see if they saw anyone they knew. They did not see anyone, so Coleman pulled down a street in order to turn around. Unknown to him, the street was a dead end, but he proceeded down the street and turned around. After turning around, he paused for a brief moment to drink some of the beer he had purchased earlier, because he did not want to be seen drinking the beer while driving on a main road. They then left that location without anything happening sexually and went in search of another secluded spot where they could have sexual intercourse. Heading back away from town, Coleman noticed a sign that read "Private drive" near Jackson-Raymond Road. Coleman misunderstood this sign to indicate that the road would afford privacy to such as he and D. P., looking for a secluded spot, away from the prying eyes of the public.
¶ 16. Upon turning down the road, Coleman saw a few houses and other structures and realized his mistake: this was no "private drive" in the sense of being a drive to afford privacy and seclusion, but rather a drive closed to the public and owned by the people who lived there. When he tried to turn around and leave, however, he became stuck in a ditch. Unable to extricate the car, he suggested to D.P. that they take the blankets and go lie down by the pond. D.P. said that she did not want to go lie down by the pond. Thus, they took the blankets and went around to the side of a nearby barn, laid down, and fell asleep. They were awakened by the first sprinklings of rain and went back to Coleman's car to get out of the rain. While in the car, according to Coleman, they finally engaged in consensual sexual intercourse. According to Coleman, the smallness of the car, a two-door hatch-back, had presented a problem throughout the night but that they finally managed in spite of the space constraints.
*473 ¶ 17. After this, D.P. desired to walk up to a nearby bar in order to call someone to come pick her up, since Coleman's car was stuck. The bar was closed, so she used a nearby pay phone; however, she did not attempt to call M.D. She attempted to call her sister and some others but was unable to get into contact with anyone. She finally resolved to walk back home. Coleman expressed no desire to walk so far and declared his intention to sleep in the car and seek someone to help extricate the vehicle tomorrow morning by daylight. Coleman returned to the car and went to sleep. Sometime later he was awakened by police lights shining in his window. He was arrested for rape and assault.

The undisputed facts after the arrest of Coleman
¶ 18. Meanwhile, M.D. began to become concerned by D. P.'s extended absence; thus, after D.P. had been gone for roughly nine hours, M.D. finally contacted the police and filed a missing person report. In part because of this, the police were already alerted to the situation with D. P., and when she called the police from the home of those that took her in, both Jackson Police and Hinds County Sheriff's Department officers responded promptly.
¶ 19. After Coleman's arrest, D.P. was taken to the hospital, where her injuries were treated, a rape kit was administered and various tests conducted. The police officers also took down several statements from D.P. during this time. The nursing staff found D.P. to be very "roughed up," with various bruises on her arms, legs, face and head; that is to say, D.P. showed various signs of having been physically beaten. In addition, the nurse who administered the rape kit found in D.P. a vaginal tear as well as the presence of semen; thus, the analysis of D.P. from the hospital was consistent with rape and assault. DNA testing later showed the semen to have come from Coleman. Coleman admits to having had sexual intercourse with D. P., but he maintained that the act was consensual. In addition, the crime scene investigators located the missing sandal in the driveway of the abandoned house, and an empty beer bottle near the private drive where Coleman's car had gotten stuck. The other significant physical evidence included the two blankets and a pocket knife taken from Coleman.

LEGAL ANALYSIS

I. DID THE TRIAL COURT ERR IN ADMITTING CERTAIN PHOTOGRAPHS THAT WERE NOT PRODUCED IN DISCOVERY?
¶ 20. Coleman argues that the photographs marked as Exhibits 25-34, taken as part of the administration of the rape kit, were not produced in discovery and should not have been admitted into evidence. Coleman also argues that these photographs should not have been admitted into evidence because they were cumulative, highly prejudicial, and lacked any real probative value.
¶ 21. The State argues that Coleman was on notice of the existence of the pictures but failed to examine them or request them and that, therefore, Coleman could not properly demonstrate a discovery violation. In addition the State argues that the pictures were probative of certain injuries suffered by D.P. and prejudicial only in the sense that they helped prove that Coleman's version of events was false.

STANDARD OF REVIEW
¶ 22. We review the admission or exclusion of evidence for abuse of discretion. Smith v. State, 839 So.2d 489, 496(¶ 17) (Miss.2003). In addition, if we find an abuse of discretion we will still not find reversible error unless a substantial *474 right of a party has been adversely affected. Farris v. State, 764 So.2d 411, 428(¶ 57) (Miss.2000).

DISCUSSION
¶ 23. In ruling on the admissibility of the pictures, the trial court declared the following:
The Court had previously at the end of last week conducted an in camera review of all of Ms. D. P.'s records that had been subpoenaed from the University Medical Center and had distributed a portion of those to counsel for both sides.
And I recall part of that was this document, sexual assault kit inventory checklist, as well as the information sheet. The information sheet lists in some detail the injuries that were observed at the medical center. The inventory checklist lists camera disk.
The Court is guided by several Supreme Court and Court of Appeals decisions that the State is not required to make sure that defense counsel reviews all evidence.
Once counsel is put on notice of the existence of the evidence, then the State has satisfied its obligation, and the burden shifts to defense counsel to either review the evidence or if the photos are undeveloped, to make arrangements to get those photos.
The court is relying on the cases of Brooks versus State, 748 So.2d at 736, in relation to dental molds and Morris versus State, 777 So.2d page 16, in regard to photographs.
Also, having compared the photographs with the detailed list of injuries, the Court is of the opinion that the proffered photographs that the Court will consider allowing into evidence ... would not result in any undue or prejudicial surprise to the defense.
So, as far as the objection goes to any alleged discovery violation, the Court finds that, number one, there has been no discovery violation and, number two, that the photographs which have been culled by the prosecutor and that I intend to further cull would not result in any undue prejudice in any event to the defense. So the objection on those grounds will be overruled.
¶ 24. Rule 9.04(I) of the Uniform Rules of Circuit and County Court Practice (URCCCP) sets forth the procedure for dealing with photographs and other materials not produced in discovery, as required by URCCCP 9.04(A). Rule 9.04(A) simply states that the prosecution must produce documentary evidence, physical evidence (including photographs), and the like to the defense before the trial. Rule 9.04(I) reads in relevant part:
I. If at any time prior to trial it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, or enter such other order as it deems just under the circumstances.
If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
1. Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and
2. If, after such opportunity, the defense claims unfair surprise or undue *475 prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.
3. The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.
URCCCP 9.04(I).
¶ 25. As the language of URCCCP 9.04(I) makes clear, however, the rule only applies when there has been a discovery violation, and the trial court in the case sub judice found that no discovery violation had occurred. Thus, the applicability of Rule 9.04(I) depends upon the presence of an actual discovery violation.
¶ 26. We find the cases cited by the trial court to be directly applicable to and dispositive of Coleman's argument, and we find that there was not a discovery violation according to the holdings in Brooks v. State, 748 So.2d 736 (Miss.1999) and Morris v. State, 777 So.2d 16 (Miss.2000). In Brooks, the lower court allowed the introduction of certain dental molds that identified the defendant as the one who had inflicted bite wounds upon the victim. Brooks, 748 So.2d at 740-41 (¶¶ 20-23). The defense objected, arguing that the molds had not been produced in discovery and that the molds could not in any event have been produced in discovery because the State had misplaced the molds. Id. The court noted that the defense was well aware of the existence of the molds, because the State had produced an inventory list of items of physical evidence that included the molds, and that the defense failed to demand the molds for examination before trial. Id. In light of this, the court held, "Brooks' failure to make a demand for discovery serves to waive his right to protest." Id. at 741(¶ 23). Thus, being on notice of the existence of the molds, the defendant's failure to demand the molds for examination before trial was held to constitute a waiver of any objection to the introduction of the molds at trial. Id.
¶ 27. Similarly, in Morris, the court allowed into evidence certain photographs taken at the victim's autopsy. Morris, 777 So.2d at 27 (¶ ¶ 50-56). The defense there, as in the case sub judice and as in Brooks, challenged the photographs as not having been produced in discovery and as unduly prejudicial. Id. at 27(¶ 50). There, as in the case sub judice and as in Brooks, the court noted that the defense was aware of the existence of the evidence, but failed to make an affirmative demand to examine the evidence prior to trial. Id. at 27(¶ 52). The court held the defense's failure to affirmatively demand the evidence for inspection after having been placed on notice of its existence constituted a waiver of any objection to the introduction of the evidence at trial. Id. Having found no discovery violation, the Morris court went on to find that the trial court did not abuse its discretion in admitting the evidence. Id. at 27 (¶ ¶ 53-56).
¶ 28. We find these cases to be dispositive of Coleman's argument on the first issue. The facts of the Morris case are, indeed, directly analogous to the facts of the case sub judice, in that the evidence in question in Morris consisted of photographs. Therefore, we find that the trial court did not commit reversible error in finding that there was no discovery violation, and we further find that the trial court did not abuse its discretion in ruling that the photographs were admissible. The trial court examined the photographs, denied the admissibility of photographs *476 that were repetitious, and denied the admissibility of a photograph depicting an injury that was not documented anywhere else in the record. The court admitted the other photographs which depicted injuries that were described in documents and medical records produced by the State and which, therefore, were known to Coleman.
¶ 29. Based upon our review of the record, we cannot say that the trial court abused its discretion in admitting the photographs into evidence; therefore, this issue is without merit.

II. DID THE TRIAL COURT ERR IN DENYING INSTRUCTION D-7, REGARDING THE LESSER-INCLUDED OFFENSE OF SIMPLE ASSAULT?
¶ 30. Coleman argues that he was entitled to have the jury instructed on the lesser-included offense of simple assault, given the fact that D. P.'s injuries were found by the hospital to be non-life threatening injuries. The State argues that there was no evidentiary basis for the lesser-included offense of simple assault; therefore, the instruction was properly refused.

STANDARD OF REVIEW
¶ 31. Our standard of review for challenges to jury instructions has been stated as follows:
[T]he instructions are to be read together as a whole, with no one instruction to be read alone or taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case. However, the trial judge may also properly refuse the instructions if he finds them to incorrectly state the law or to repeat a theory fairly covered in another instruction or to be without proper foundation in the evidence of the case.
Howell v. State, 860 So.2d 704, 761 (¶ 203) (Miss.2003) (quoting Thomas v. State, 818 So.2d 335, 349(¶ 47) (Miss.2002)). Regarding lesser-included offense instructions more specifically we have held, "In order to be entitled to a lesser-included offense instruction there must be some evidence in the record from which a jury could, other than by mere surmise, find a defendant not guilty of the crime charged and at the same time find him guilty of a lesser-included offense." Washington v. State, 794 So.2d 253, 259(¶ 11) (Miss.Ct.App. 2001).

DISCUSSION
¶ 32. In denying Coleman's proposed jury instruction D-7, the trial court declared:
D-7 will be refused. As I understand it, the difference between aggravated assault and simple assault in this instance would hinge on whether or not the jury believed from the evidence beyond a reasonable doubt that Ms. D.P. was struck or hit and kicked, causing bodily injury by the defendant, but not by means such as to constitute a deadly weapon and not by any other means likely to produce death or serious bodily harm.
The Court will deny the instruction because there's no evidentiary basis to grant the lesser included defense [sic] instruction in the Court's opinion. The defendant is entitled to present his theory of the case to the jury, but the defendant denies striking her in any manner.
The Court would certainly grant the instruction if we had testimony that indicated that the defendant struck the alleged victim but that it was not in a manner likely to produce death or serious bodily harm.
¶ 33. We can find no reversible error in this ruling. As the trial court noted, due *477 to Coleman's defense posture that he did not strike or beat D.P. in any way and that he did not know how she acquired so many injuries consistent with having been beaten, there was not sufficient proof put on to justify the lesser-included offense instruction. As the Washington case cited above notes, "Because there is no alternative account to consider, there is no evidentiary basis for an instruction [on the lesser-included offense]." Washington, 794 So.2d at 258-59(¶ 11). Coleman's bald assertions that he did not strike D.P. and that he did not know how D.P. became injured provided no alternative account with any evidentiary support so as to justify a lesser-included offense instruction.
¶ 34. Therefore, we find that the trial court did not commit reversible error in refusing to give an instruction on the lesser-included offense of simple assault, and we find this issue to be without merit.

III. DID THE TRIAL COURT ERR IN DENYING COLEMAN'S MOTION FOR DIRECTED VERDICT?
¶ 35. Coleman argues that the trial court committed reversible error in denying his motion for directed verdict at the close of the State's case-in-chief. The State argues that the evidence was legally sufficient to support the verdict, and that, in any event, the standard of review creates far too high a wall for Coleman to scale in this case.

STANDARD OF REVIEW
¶ 36. In reviewing a trial court's decision on a motion for directed verdict, we "consider the evidence in the light most favorable to the appellee, giving the appellee the benefit of all favorable inferences that may be reasonably drawn from the evidence." Gatewood v. Sampson, 812 So.2d 212, 219(¶ 11) (Miss.2002) (citing Steele v. Inn of Vicksburg, Inc., 697 So.2d 373, 376 (Miss.1997)). We have also held in this regard:
If the facts are so overwhelmingly in favor of the appellant that a reasonable juror could not have arrived at a contrary verdict, this Court must reverse and render. On the other hand, if substantial evidence exists in support of the verdict, that is, "evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions," then this Court must affirm.
Gibson v. Wright, 870 So.2d 1250, 1255(¶ 9) (Miss.Ct.App.2004) (citations omitted). Thus, our standard of review is extremely deferential, and the appellant faces a formidable obstacle in the standard of review itself.

DISCUSSION
¶ 37. This issue need not detain us long, for, very simply, viewing the evidence in the light most favorable to the verdict, we cannot say that a reasonable juror could only have found Coleman not guilty. On the contrary, based upon our review of the record we find that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions. That being the case, pursuant to our deferential standard of review, we must affirm the trial court's judgment on this issue.

IV. WAS THE JURY'S VERDICT CONTRARY TO LAW AND AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
¶ 38. Finally, Coleman argues that the jury's verdict was contrary to law and against the overwhelming weight of the evidence in that, if the jury acquitted Coleman of two of the counts of rape, they should have acquitted him of all of the counts of rape. The State argues that the *478 weight of the evidence supports the jury's verdict.

STANDARD OF REVIEW
¶ 39. Our standard of review of challenges to the weight of the evidence has been stated as follows: "Only when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal." Herring v. State, 691 So.2d 948, 957 (Miss.1997). In addition, our supreme court has held that the standard of review to challenges based upon the weight of the evidence are "limited in that all evidence must be construed in the light most favorable to the verdict." Id.

DISCUSSION
¶ 40. As with the previous issue, this issue need not detain us long either. As noted above, D.P. and Coleman gave vastly different accounts of what happened on the night in question, and in the face of such contradictory factual assertions, the jury had to decide which party's story was most credible and at which points. Womack v. State, 774 So.2d 476, 484 (¶¶ 22-23) (Miss.Ct.App.2000). The jury decided that D. P.'s story was most credible at most points, although the jury did apparently credit some parts of Coleman's story. Thus, the jury determined, as it was certainly free to do, that there was reasonable doubt as to two of the three rape counts but not as to one. Construing what we find in the record in the light most favorable to the verdict, we cannot say that to allow the verdict to stand would sanction an unconscionable injustice. Therefore, this issue is also without merit.
¶ 41. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY OF CONVICTION OF ONE COUNT OF FORCIBLE RAPE AND SENTENCE OF TWENTY FIVE YEARS AND ONE COUNT OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY YEARS, AS AN HABITUAL OFFENDER, TO BE SERVED IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH SENTENCES TO RUN CONSECUTIVELY, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.