999 So.2d 393 (2008)
Tavares Antoine FLAGGS, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2006-KA-01702-COA.
Court of Appeals of Mississippi.
May 27, 2008.
Rehearing Denied October 14, 2008.
Certiorari Denied January 22, 2009.
*395 Donald W. Boykin, Jackson, William R. Labarre, attorneys for appellant.
Office of the Attorney General by Deirdre McCrory, Charles W. Maris, attorneys for appellee.
Before LEE, P.J., BARNES and ISHEE, JJ.
BARNES, J., for the Court.
¶ 1. Tavares Antoine Flaggs was convicted in the Circuit Court of Hinds County of murder and sentenced to a term of life imprisonment. Aggrieved, he now appeals, arguing that the trial court erred in (1) denying his motion for a continuance; (2) granting the State's challenge for cause of one juror, but denying his challenge for cause as to another; and (3) allowing the introduction of certain challenged evidence. Finding no reversible error, we affirm.

SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. On October 12, 2005, a grand jury in Hinds County indicted Flaggs for the murder of Derrick Wright pursuant to Mississippi Code Annotated section 97-3-19(1) (Rev.2006). Flaggs pleaded not guilty. On July 24, 2006, in the Circuit Court of Hinds County, Flaggs's three-day jury trial began. The State called ten witnesses in its case-in-chief, and the defense called no witnesses.
¶ 3. On the first day of the trial, Flaggs's attorney moved for a two-week continuance so that he could obtain the results of a toxicology screen that was being performed on Wright's blood. The attorney argued that Flaggs had alleged that he and Wright were smoking cocaine at the time of Wright's death, and therefore, the results of the toxicology report were necessary to corroborate this allegation and Flaggs's contention that Wright was the initial aggressor. The attorney for the State responded that, in preparing for the case, he had noticed that a toxicology screen had not been performed on Wright's blood; so he ordered one. However, the results were not available when the trial began. The State objected to the continuance on the grounds that the toxicology report was work product that the State was not required to create for the defendant. The State also argued that the existence of the blood had been noted in the file since the beginning of the case, yet the defense did not request any testing until the week before the trial and after the State had already ordered the toxicology screen. Flaggs's attorney countered that he had no reason to believe that the screen had not been performed.
¶ 4. The trial judge denied the motion for a continuance, stating that the prosecution is not obligated to test every item of evidence that is collected. The trial court further reasoned that the defense had been on notice since December of the previous year that the blood was collected and that there was not a toxicology report in *396 the discovery. The trial judge noted that the fact that Wright may have been on cocaine at the time of the incident in question did not automatically result in the conclusion that he was the initial aggressor, stating that in order to be probative on the issue of self-defense, there had to be a link other than the mere fact that Wright was on cocaine.
¶ 5. Flaggs's attorney also filed a motion in limine on the first day of trial regarding the State's intention to introduce into evidence a post-shoulder-surgery apparatus purportedly worn by Wright prior to his death. He renewed his objection immediately prior to opening statements. Defense counsel argued that he only learned of the existence of the apparatus the day before the trial. This fact was admitted by the assistant district attorney, who indicated that the apparatus was not brought to his attention until the previous day. The trial court denied the motion in limine, finding that the apparatus was probative in that it corroborated that Wright received some type of medical treatment on his shoulder. The trial court further found that, because the State had just learned of the apparatus on the previous day, there was no discovery violation; therefore, the Box procedure was not triggered.[1]
¶ 6. During voir dire, prospective juror Johnny E. Byrd stated that as a result of his job as a business system analyst for the City of Jackson, he knew most of the detectives in the Jackson Police Department, including Amos Clinton and Perry Tate, both of whom were potential witnesses in the trial. He also stated that he knew Dr. Steven Hayne, the medical examiner who performed the autopsy on Wright's body. Byrd repeatedly stated that he could be fair and impartial. When asked if viewing graphic pictures would have an effect on him, Byrd replied that as a part of his duties with the police department, he may have inadvertently seen graphic pictures, but he did not try to remember particular pictures and that the pictures would not have an effect on him. Flaggs challenged Byrd for cause on the ground that he could be not fair and impartial given his knowledge of the individuals involved in the case. The trial judge denied the challenge based on Byrd's repeated assurances that he could be fair and impartial.
¶ 7. In light of his responses during voir dire regarding whether he had ever been arrested, prospective juror Willie D. Sutton was recalled by the State and questioned further. When asked whether he understood the attorney's question, Sutton responded that he did not and that he did not know what the attorney was talking about. He stated that he did not really know what the word "arrest" meant. When asked if he thought he would be able to follow the proceedings in the case, he replied that he could not. When asked again if he could assure the attorney and the court that he would be able to follow the proceedings, he shook his head negatively. Flaggs's attorney then questioned Sutton regarding his arrest. When defense counsel asked Sutton if he was convicted of arson, Sutton asked what the attorney meant and then stated that his case had been thrown out of court. He could not say whether he was prosecuted in youth court or circuit court. The State challenged Sutton for cause, and the trial judge granted the challenge.
¶ 8. The evidence presented at trial established that, on April 25, 2005, Wright *397 was found dead in his apartment. His brother, Christopher Wright (Christopher); Christopher's wife Linda; and a friend, James Archie (Archie), went to Wright's apartment in Jackson, Mississippi after Wright's mother and cousin became concerned that they had not seen or heard from him in some time. The doors to the apartment were locked, and Wright did not answer; so Christopher and Archie entered through a window. Upon entering, they smelled a bad odor. Archie subsequently saw Wright lying on the floor covered in blood with what looked like cut marks all over him. Archie, Christopher, and Linda called the Jackson Police Department (JPD) and waited outside for them for approximately an hour before Christopher reentered the apartment. He saw Wright's body lying on the floor with his body turned to the side and his hands raised in the air. The three made sure not to touch anything in the apartment before the police arrived.
¶ 9. Officer Robert Jackson of the JPD was dispatched to the apartment. Upon entering, Jackson observed Wright dead on the floor on his back with his hands up. He observed faint footsteps that appeared to be in blood extending from the hallway to the walk-in closet and a white t-shirt that appeared to be soaked in blood. Subsequently, crime scene investigator Charles Taylor arrived and began to process the crime scene. He observed cast-off blood stains and multiple impact blood stains on the north wall of the hallway in the apartment. He further observed the aforementioned faint footprints around the body of the victim and white t-shirt with what appeared to be blood stains on it. Taylor found a wallet that was open with its contents turned out on the coffee table. He also found a bloodstained towel in the garbage can, a knife blade with no handle in the sink, and two other knives on the counter by the sink. A fingerprint was recovered from one of the knives collected from the crime scene, which was later identified as Flaggs's fingerprint.
¶ 10. Dr. Hayne, the forensic pathologist who performed an autopsy on Wright's body, testified at trial as an expert witness for the State. The defense stipulated to Dr. Hayne's qualifications as a forensic pathologist. Dr. Hayne testified that the body's level of decomposition indicated that Wright had been dead for a period of time. He stated that Wright had sustained fifteen stab wounds, one chop wound, and three slash wounds, with the fatal injury being a stab wound to the carotid artery and jugular vein in the neck. He opined that a stab wound to the back of the hand, a slash wound to the left forearm, and chop wound to the fourth finger on the left hand indicated defensive posturing on the part of Wright. According to Dr. Hayne, the sites of the body on which these wounds were located are commonly used to protect the neck, face, and part of the head from injury; however, Dr. Hayne testified that he could not determine the order in which Wright's injuries were received, but he could say that there was heart activity at the time the injuries were sustained. Dr. Hayne concluded that Wright died as the result of a homicide.
¶ 11. The State then questioned Dr. Hayne in hypothetical terms regarding the positioning of the blood spatter that was present at the crime scene. The defense objected on the grounds that Dr. Hayne was not qualified to give an opinion because he had no knowledge of the crime scene and because he had not been qualified as an expert in blood spatter. The trial judge overruled the objection. After being shown a diagram of the crime scene, Dr. Hayne testified as follows regarding the blood spatter:

*398 It would indicate two things, counselor. The blood spattering could be cast off from a weapon or it could be cast off from the decedent, and the decedent could be moving in a backward position away from the indicated area where the blood spatter was located. That would be a distinct possibility. Falling backwards. He could have possibly been dragged forward into an enclosed area, which would seem less likely since I don't see any footprints in the area in the photograph you showed me.
Dr. Hayne was then asked how much blood spatter he would expect to come from the body if Wright was attacked in the way that he had found; Dr. Hayne responded:
I think the two major injuries, counselor, that would produce some blood spatter would be off his right forearm and off his hand. I would expect that hand to be moving since we show changes consistent with defensive posturing injury. I think, also, that there is a possibility that there would be some blood spatter coming out or ejected from the right side of the neck, counselor, that would be coming out under some pressure.
¶ 12. Flaggs did not testify at trial; however, the tape recording of his interrogation by the police was admitted into evidence and played for the jury.[2] On the tape, Flaggs told the police that he was walking near Wright's apartment when Wright asked him if he wanted to smoke dope. Flaggs stated that he went into the apartment, and the two smoked cocaine. He claimed that Wright began acting paranoid and was running around the apartment accusing Flaggs of trying to harm him and threatening Flaggs with a screwdriver. According to Flaggs, Wright lunged at him with the screwdriver, at which time Flaggs took the screwdriver from Wright and wrestled him to the floor near the bathroom. Flaggs stated that when Wright went to the kitchen and grabbed a knife, he picked up a knife as well. Flaggs claimed that Wright then ran toward him with the knife; so he tried to stab Wright. However, his knife was too flimsy, and he threw it down. Flaggs stated that the two struggled down the hallway, during which time Wright cut him on the arms and bit him. According to Flaggs, Wright grabbed a butcher knife, but Flaggs took it away from him. Flaggs stated that he was in fear for his life; so he stabbed and cut Wright multiple times. He then took off his white t-shirt, left it in the closet, put on one of Wright's shirts, and ran out of the apartment.
¶ 13. Both Christopher and Archie testified that the last time they saw Wright, approximately one week prior to his death, he was wearing a "sling" or "brace" on his arm as a result of his recent shoulder surgery. Christopher stated that the sling had a "big cushion" in it that "pushed [Wright's] arm away from his body." He further stated that Wright wore the sling "basically all the time." After Christopher confirmed that it was the sling worn by Wright, the State offered the shoulder sling into evidence.
¶ 14. The jury convicted Flaggs of murder, and he was sentenced to life in prison. Flaggs then filed a motion for a judgment notwithstanding the verdict or, in the alternative, a new trial, which the trial judge denied. Flaggs now appeals, arguing the following grounds for relief: (1) the trial court erred in denying Flaggs's motion for a continuance; (2) the trial court erred in granting the State's challenge for cause of *399 prospective juror Sutton; (3) the trial court erred in denying Flaggs's challenge for cause of prospective juror Byrd; (4) the trial court erred in allowing Dr. Hayne to testify regarding blood spatter when he was not qualified as a blood spatter expert; and (4) the trial court erred in overruling Flaggs's objection to the introduction of a post-shoulder-surgery apparatus without following the Box procedure.

DISCUSSION OF THE ISSUES

I. Whether the trial court erred in denying Flaggs's motion for a continuance.
¶ 15. Flaggs first contends that the trial judge erred when he denied his motion for a two-week continuance so that he could obtain the results of the toxicology screen being performed on Wright's blood. He argues that the results of the toxicology screen could have been critical to his defense given his allegations that Wright was on cocaine and was the initial aggressor.
¶ 16. "When reviewing a lower court's denial of a motion for continuance, we look to see whether the court abused its discretion in denying the continuance." Johnson v. State, 926 So.2d 246, 251(¶ 15) (Miss.Ct.App.2005) (citing Shelton v. State, 853 So.2d 1171, 1181(¶ 35) (Miss.2003)). "We will not reverse `unless the ruling resulted in manifest injustice.'" Id. However, "the denial of a continuance is not an issue reviewable on appeal where the denial of the continuance is not assigned as a ground for a new trial in the defendant's post-trial motion for a new trial." Id. at (¶ 14) (quoting Crawford v. State, 787 So.2d 1236, 1242(¶ 25) (Miss.2001)).
¶ 17. Flaggs's motion for a judgment notwithstanding the verdict or, in the alternative, a new trial contained numerous claims, none of which was the trial court's denial of his motion for a continuance. Accordingly, Flaggs is procedurally barred from raising this issue on appeal.
¶ 18. Notwithstanding the procedural bar, Flaggs's assignment of error is without merit. First, Flaggs cites to no authority that would require the State to test every item of evidence collected. Second, the existence of the blood was noted in the case file from the beginning, and Flaggs made no attempt to have it tested until the week before the trial. Finally, as the trial court noted, the fact that Wright was on cocaine at the time of the incident in question does not automatically indicate that he was the initial aggressor. Accordingly, we find no abuse of discretion in the trial court's denial of Flaggs's motion for a continuance. This issue is both procedurally barred and without merit.

II. Whether the trial court erred in granting the State's challenge for cause of prospective juror Sutton.
¶ 19. Flaggs next contends that the trial court erred in granting the State's challenge for cause of prospective juror Sutton. During voir dire, Sutton was repeatedly asked whether he believed himself capable of following the proceedings in the case. Each time he responded that he did not think he was capable of doing so. The exchange between Sutton and the assistant district attorney during voir dire was as follows:
Q: Mr. Sutton, I apologize for calling you back. Are you 26 years of age?
A: Yes, sir.
Q: Were you arrested on March 24, 1998 in Hinds County for the crime of arson?
A: Yes.
Q: Okay. Did you understand the question that Mr. Weinberg asked?
A: No, sir.

*400 Q: You did not understand the question all four times?
A: No, sir.
Q: Okay. What part did you not understand?
A: I didn't know what he was talking about.
Q: You didn't know what the word arrest meant?
A: Not really?
Q: Okay. Do you think you would be able to follow the proceedings in this case?
A: No, sir.
Q: You don't?
A: No.
Q: Okay. Can you assure us that you would be able to follow the proceedings in this case? Can you tell us certainly that you would be able to follow the proceedings in this case?
A: (Juror shakes head negatively.)
¶ 20. Flaggs contends that there was nothing to suggest that Sutton was incapable of being impartial; therefore, there was no basis for excusing him from the jury. Flaggs also argues that the question asked of Sutton was vague, and no one explained to him what was meant by "follow the proceedings." He contends that there is no case law requiring that a juror be knowledgeable about criminal procedure or have a certain level of intelligence.
¶ 21. "Under Mississippi law, excusing a juror for cause lies within the discretion of the trial court." Pierre v. State, 607 So.2d 43, 49 (Miss.1992) (citations omitted). "The general rule holds that the court may remove a juror for cause when a party has cause to challenge the juror's competency or impartiality." Id. (citing Woodward v. State, 533 So.2d 418, 424 (Miss.1988)). Based on the record before us, the trial court did not abuse its discretion in granting the State's challenge for cause regarding Sutton. Sutton repeatedly indicated that he could not follow the proceedings of the trial. In order to ensure that the most fair and accurate verdict is reached, a juror should, at the very least, be able to follow the proceedings. As Sutton's responses during voir dire indicated that he was not competent to serve on the jury, the trial court's decision to grant the State's challenge for cause is supported by the record. Accordingly, we find no abuse of discretion, and this issue is without merit.

III. Whether the trial court erred in denying Flaggs's challenge for cause of prospective juror Byrd.
¶ 22. Flaggs argues that the trial court committed reversible error in denying his challenge for cause of juror Byrd. Byrd admitted during voir dire that, as a result of his job as an analyst for the JPD, he knew all of the police officers. He stated that he knew Dr. Hayne and Clinton, both of whom were involved in Flaggs case and testified at trial.[3] Byrd also stated that he may have seen some gruesome crime scene photographs; he did not say, however, that he had seen any photographs from Flaggs's case. He stated that he did not try to remember particular pictures and that the pictures would not have an effect on him.
¶ 23. Flaggs argues that the above facts indicated that Byrd likely could not be fair and impartial; therefore, he should not have been allowed to sit on the jury. Again, the trial judge has considerable discretion is determining whether to excuse a *401 potential juror, and we will reverse his decision only if we find that he has abused his discretion. Pierre, 607 So.2d at 49. With regard to this issue, the Mississippi Supreme Court has stated as follows:
To the extent that any juror, because of his relationship to one of the parties, his occupation, his past experience, or whatever, would normally lean in favor of one of the parties, or be biased against the other, or one's claim or the other's defense in the lawsuit, to this extent, of course, his ability to be fair and impartial is impaired. It should also be borne in mind that jurors take their oaths and responsibilities seriously, and when a prospective juror assures the court that, despite the circumstance that raises some question as to his qualification, this will not affect his verdict, this promise is entitled to considerable deference.

Duncan v. State, 939 So.2d 772, 779(¶ 23) (Miss.2006) (quoting Scott v. Ball, 595 So.2d 848, 850 (Miss.1992)) (internal citations omitted). "[S]election of jurors [is] a judgment call peculiarly within the province of the circuit judge, and ... we will not on appeal second guess [that judgment] in the absence of a record showing a clear abuse of discretion." Scott, 595 So.2d at 850.
¶ 24. Here, Byrd repeatedly stated that, despite his knowledge of the individuals involved, he could be fair and impartial and would decide the case based only on the evidence presented. As noted above, Byrd's statements in this regard were entitled to considerable deference from the trial court, and the trial court's determination that Byrd was capable of being fair and impartial is entitled to similar deference from this Court. We cannot say that the trial judge abused his discretion in denying Flaggs's challenge for cause. Accordingly, this issue is without merit.

IV. Whether the trial court erred in allowing Dr. Hayne to testify regarding blood spatter.
¶ 25. Flaggs next argues that the trial court committed reversible error in admitting the testimony of Dr. Hayne regarding blood spatter, because Dr. Hayne was never qualified as a blood spatter expert. Dr. Hayne, a forensic pathologist, performed the autopsy on the victim. At trial, Flaggs's counsel stipulated to Dr. Hayne's qualifications as a forensic pathologist. Dr. Hayne explained that the two main tasks in forensic pathology are determination of the cause of death and determination of the manner of death, with the cause of death being the medical reason that a person died and the manner of death being the classification of the death as a homicide, suicide, accident, or natural.
¶ 26. "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence." Ross v. State, 954 So.2d 968, 996(¶ 56) (Miss.2007) (citing Walker v. State, 878 So.2d 913, 915(¶ 12) (Miss.2004)). "However, this discretion must be exercised within the confines of the Mississippi Rules of Evidence." Id. (citing Cox v. State, 849 So.2d 1257, 1268(¶ 36) (Miss.2003); M.R.E. 103(a)). "Reversal is proper only where such discretion has been abused and a substantial right of a party has been affected." Id.
¶ 27. "The admissibility of expert testimony is evaluated in light of M.R.E. 702, which holds that such testimony may be introduced when it is found to be relevant and reliable." Id. at (¶ 57) (citing Miss. Transp. Comm'n v. McLemore, 863 So.2d 31, 38(¶ 16) (Miss.2003); M.R.E. 702). "Testimony is relevant if it will assist the trier of fact in understanding or determining a fact at issue." Id. "To meet the requirement of reliability, an expert's testimony must be based on the methods and procedures of science, and *402 not merely on subjective beliefs or unsupported speculation." Id. (citing McLemore, 863 So.2d at 36(¶ 11)). "Rule 702 expressly allows expert testimony regarding non-scientific matters, so long as the witness's knowledge, skill, experience, training, or education qualify him as an expert in a given field, and (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case." Id. at 996-97(¶ 57); see also M.R.E. 702.
¶ 28. When asked whether the blood spatter as indicated in the crime scene diagram assisted him in forming an opinion as to how the victim came to rest in his final position, Dr. Hayne testified, over objection:
It would indicate two things, counselor. The blood spattering could be cast off from a weapon or it could be cast off from the decedent, and the decedent could be moving in a backward position away from the indicated area where the blood spatter was located. That would be a distinct possibility. Falling backwards. He could have possibly been dragged forward into an enclosed area, which would seem less likely since I don't see any footprints in the area in the photograph you showed me.
Further, when asked how much blood spatter he would expect to come from the body if he was attacked in the way Dr. Hayne determined, Dr. Hayne testified, again over objection:
I think the two major injuries, counselor, that would produce some blood spatter would be off his right forearm and off his hand. I would expect that hand to be moving since we show changes consistent with defensive posturing injury. I think, also, that there is a possibility that there would be some blood spatter coming out or ejected from the right side of the neck, counselor, that would be coming out under some pressure.
On cross examination, when asked about the "possibilities" he had discussed, Dr. Hayne stated: "It would be based upon the evidence shown to me going to the level of confidence I have based upon the evidence only shown to be in the courtroom." On examination by the court, Dr. Hayne stated that, while he spoke in terms of "possibilities," none of his opinions fell short of opinions "based on a reasonable degree of medical certainty."
¶ 29. This Court has held that "it is the duty of a forensic pathologist to answer `two basic questions: what was the cause of death, and what was the manner of death?'" Williams v. State, 937 So.2d 35, 42(¶ 20) (Miss.Ct.App.2006). The Court further stated that:
In Mississippi, a forensic pathologist may testify as to what caused the victim's injuries and what trauma the injuries would produce. McGowen v. State, 859 So.2d 320, 335(¶ 53) (Miss.2003) (citing Holland v. State, 705 So.2d 307, 341 (¶ 129) (Miss.1997)). Moreover, a forensic pathologist's testimony concerning the victim's wounds, suffering, and the means of infliction of injury falls within the bounds of his expertise. Id. (citing Holland, 705 So.2d at 341 (¶ 127)).
Id. at 42-43(¶ 20). The State contends that the field of forensic pathology encompasses the analysis of crime scenes, which would include blood spatter. While the State cites no authority supporting this proposition, we note that Dr. Hayne has been accepted in other cases as an expert in the analysis of blood spatter. See Wooten v. State, 811 So.2d 355, 358(¶ 4) (Miss. Ct.App.2001) (Dr. Hayne discussed his opinion of photographs showing blood splatters on the walls); see also State v. Hopkins, 799 So.2d 1234, 1240 (La.Ct.App. *403 2001). Moreover, our supreme court has indicated that forensic pathologists are qualified to give opinions regarding blood spatter. See Whittington v. State, 523 So.2d 966, 976 (Miss.1988).[4] Therefore, while there was no mention of blood spatter analysis during Dr. Hayne's expert qualification, we cannot say under the circumstances of this case that the trial court erred in allowing Dr. Hayne to testify regarding blood spatter. However, in order to ensure that expert opinions are reliable and well-founded, we strongly urge trial judges to adequately develop the record as it pertains to expert qualifications.
¶ 30. Notwithstanding this finding, we feel compelled to note that, in our opinion, Dr. Hayne's testimony regarding blood spatter was far too speculative to have been reliable.[5] In expressing his opinions on the blood spatter found at the crime scene, Dr. Hayne repeatedly used the phrase "could be" and spoke in terms of "possibilities." The trial judge, apparently recognizing a potential issue with the testimony, questioned Dr. Hayne as to whether his opinions were based on a reasonable degree of medical certainty. Although Dr. Hayne attempted to verify that his opinions were based on a reasonable degree of medical certainty, the equivocal nature of his testimony casts doubt on his assertion.
¶ 31. Even assuming that the admission of Dr. Hayne's testimony was error, we do not find it to be reversible error under the circumstances of this case. "A ruling on evidence is not error unless a substantial right of the party is affected." Edmonds v. State, 955 So.2d 787, 792(¶ 9) (Miss.2007) (citing Green v. State, 614 So.2d 926, 935 (Miss.1992)); see also Holland v. State, 705 So.2d 307, 344 (Miss. 1997) (citing Russell v. State, 607 So.2d 1107, 1114 (Miss.1992) ("Harmless error... results if the evidence does not impinge upon a substantial right of the defendant.")).
¶ 32. Flaggs argues that Dr. Hayne's testimony regarding blood spatter was detrimental to his claim that he acted in self-defense in light of the State's contention that a significant number of Wright's wounds were the result of his trying to defend himself. We disagree. First, at no time did Dr. Hayne definitely state that the blood spatter patterns indicated that Wright was defending himself at the time his wounds were inflicted. Flaggs points to Dr. Hayne's statement that he "would expect that hand [right forearm] to be moving since we show changes consistent with defensive posturing injury." However, while Dr. Hayne made this statement in response to a question regarding blood spatter, his conclusion is based on defensive posturing not blood spatter. Dr. *404 Hayne's conclusion of defensive posturing derived from the wounds' type and his testimony regarding a victim's wounds are within the expertise of a forensic pathologist. See Williams, 937 So.2d at 42-43(¶ 20). Moreover, Dr. Hayne had previously testified at length regarding Wright's wounds, and he stated specifically that the stab wound to the back of Wright's hand, the slash wound to his left forearm, and the chop wound to his fourth finger on his left hand indicated that Wright was defending himself at the time he sustained these injuries. Therefore, if the trial court erred in admitting Dr. Hayne's testimony regarding blood spatter, we find that this error was harmless. Even if such testimony had been excluded, the jury heard Flaggs admit to stabbing Wright multiple times on the tape of his interrogation, and given the testimony of Dr. Hayne regarding defensive posturing, there was sufficient evidence from which the jury could conclude that Flaggs did not act in self-defense in killing Wright. Accordingly, we are convinced that exclusion of the blood spatter testimony would not have changed the outcome of the trial. See Rash v. State, 840 So.2d 774, 777(¶ 12) (Miss.Ct.App.2003) (finding harmless error when, even if improperly admitted expert testimony was excluded, there was sufficient evidence of guilt to convince the Court that the outcome of the trial would have been the same). This assignment of error is without merit.

V. Whether the trial court erred in overruling Flaggs's objection to the introduction of a post-shoulder-surgery apparatus without following the Box procedure.
¶ 33. In his final assignment of error, Flaggs argues that the trial court erred in overruling his objection to the introduction of the post-shoulder-surgery apparatus, purportedly worn by the victim, without following the Box procedure when Flaggs was not made aware of the existence of the apparatus until the day before the trial. Prior to trial, Flaggs filed a motion in limine seeking to exclude evidence regarding shoulder or back surgery undergone by Wright prior to the incident in question on the ground that he had only been made aware of the purported testimony the week before the trial. The State responded that Wright's brother, Christopher, and Archie were expected to testify that Wright had back and shoulder surgery prior to the incident and to describe their observations of his physical condition. Flaggs's attorney argued that he had no knowledge of how the individuals came to know of the surgery or of the time period involved. The trial court denied the motion in limine, stating that, as with any evidence, the State would have to lay the proper predicate.
¶ 34. Then, once the jury had been selected and the trial was set to begin, Flaggs objected to the State's intention to introduce into evidence a post-shoulder-surgery apparatus allegedly worn by Wright. He argued that he had only been made aware of the existence of the apparatus the day before. The attorney for the State responded that he too had learned of the apparatus only the day before. He stated that both Wright's brother and Archie intended to testify that Wright was wearing the apparatus the last time they saw him alive, approximately a week prior to his death. Flaggs's attorney again noted that he had no way of knowing if the surgery actually occurred and that he did not know if the apparatus was prescribed by a doctor who had assessed Wright's physical capabilities. The trial court overruled Flaggs's objection, stating that the apparatus would be probative in corroborating the evidence that Wright had undergone some type of medical treatment involving his shoulder. With regard to *405 Flaggs's argument that he was notified of the apparatus only the day before the trial, the trial court found that, because the State only discovered the apparatus the day before as well, there was no discovery violation, and therefore, the Box procedure was not triggered.
¶ 35. Flaggs contends that the trial court erred in finding that, because no discovery violation had occurred, the Box procedure was not triggered. We review the admission or exclusion of evidence for abuse of discretion. Coleman v. State, 915 So.2d 468, 473(¶ 22) (Miss.Ct.App.2005) (citing Smith v. State, 839 So.2d 489, 496(¶ 17) (Miss.2003)). An abuse of discretion does not constitute reversible error unless a substantial right of a party has been adversely affected. Id. at 473-74(¶ 22) (citing Farris v. State, 764 So.2d 411, 428(¶ 57) (Miss.2000)).
¶ 36. "Rule 9.04(I) of the Uniform Rules of Circuit and County Court Practice (URCCCP) sets forth the procedure for dealing with photographs and other materials not produced in discovery, as required by URCCCP 9.04(A)." Id. at 474(¶ 24). "Rule 9.04(A) simply states that the prosecution must produce documentary evidence, physical evidence (including photographs), and the like to the defense before the trial." Id. Rule 9.04(I) follows the procedure set forth in Box v. State, 437 So.2d 19, 23 (Miss.1983) (Robertson, J., specially concurring), and states as follows in pertinent part:
If at any time prior to trial it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, or enter such other order as it deems just under the circumstances.
If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
1. Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and
2. If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.
3. The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.
The court shall follow the same procedure for violation of discovery by the defense.
URCCC 9.04(I).
¶ 37. As was noted above, the trial court overruled Flaggs's objection to the introduction of the apparatus on the grounds that the State had not committed a discovery violation; therefore, the trial court concluded that the Box procedure was not triggered. Flaggs does not argue that the State committed a discovery violation regarding the apparatus, and we agree with the trial court's finding that there was no such violation; the State notified Flaggs of the apparatus as soon as it became aware of its existence.
*406 ¶ 38. This finding, however, is not dispositive on the issue of whether the Box procedure should have been followed in this case. As the State notes, this Court has previously held that the procedure set forth in Uniform Rule of Circuit and County Court 9.04(I) is only required when there has been a discovery violation. See Coleman, 915 So.2d at 475(¶ 25). Decisions of the Mississippi Supreme Court, however, have not indicated that the law on this issue is entirely clear. Compare Russell v. State, 789 So.2d 779, 786(¶ 28) (Miss.2001) ("We have articulated no requirement in Box or Ramos that the trial court find a discovery violation before allowing the defendant to interview the witness and proceed through the steps outlined above....")[6]with Berry v. State, 882 So.2d 157, 165(¶ 28) (Miss.2004) (citing Russell and Ramos v. State, 710 So.2d 380, 385 (Miss.1998), as setting forth the guidelines "for trial judges to follow when dealing with discovery violations."). However, we need not resolve this issue in the present case because we find that, even assuming the trial court erred in failing to follow the Box procedure, the error was harmless.
¶ 39. "[T]his Court has ... held many times that `a violation of Rule 9.04 is considered harmless error unless it affirmatively appears from the entire record that the violation caused a miscarriage of justice.'" Lofton v. State, 818 So.2d 1229, 1237(¶ 32) (Miss.Ct.App.2002) (citing Wooten v. State, 811 So.2d 355, 366(¶ 31) (Miss. Ct.App.2001)); see also Payton v. State, 897 So.2d 921, 942(¶ 67) (Miss.2003). With regard to harmless error, the Mississippi Supreme Court has stated:
To warrant reversal, two elements must be shown: error, and injury to the party appealing. Error is harmless when it is trivial, formal, or merely academic, and not prejudicial to the substantial rights of the party assigning it, and where it in no way affects the final outcome of the case; it is prejudicial, and ground for reversal, only when it affects the final result of the case and works adversely to a substantial right of the party assigning it. Obviously, in order for the rule of harmless error to be called into play in support of a judgment, the judgment must be otherwise supportable, and will be reversed when there is nothing in the pleadings or evidence to support it.
Gray v. State, 799 So.2d 53, 61(¶ 30) (Miss. 2001) (citation omitted); see also Forrest v. State, 335 So.2d 900, 903 (Miss. 1976) ("[A]n error is harmless only when it is apparent on the face of the record that a fair[-] minded jury could have arrived at no verdict other than that of guilty.").
¶ 40. On the record before us, we find that the admission of the shoulder apparatus did not affect the final result of the case nor did it work adversely to a substantial right of Flaggs. See id. Flaggs contends that the admission of the apparatus was harmful to his self-defense theory in that its purpose was to show that Wright was incapable of being the initial aggressor; he argues that he was not given an opportunity to interview Christopher about the apparatus, through whom the apparatus was introduced, nor was he given the opportunity to investigate the victim's alleged use of or need for the apparatus.
*407 ¶ 41. However, as was discussed above, Dr. Hayne testified as to Wright's numerous wounds and how some of those wounds indicated that Wright was defending himself at the time he sustained the wound. Therefore, even if the shoulder apparatus had been excluded, there was significant evidence contradicting Flaggs's claim that he acted in self-defense in killing Wright. Moreover, prior to any discussion of the shoulder apparatus, Christopher testified at length about the fact that Wright had recently had shoulder and back surgery and the effects of those surgeries. This testimony was as follows:
Q: Now, Chris, tell us about the last time you saw your brother alive; that is, your brother Derrick. How long was that before you later saw him dead?
A: I saw him alive a week before I saw him dead.
Q: And what was his condition at the time you saw him alive?
A: The last time I saw him alive he was recovering from a back surgery and a shoulder surgery. He was in good spirits. He washis shoulder caused him problems just making certain motions and stuff. So he was dealing with the pain of his shoulder. Didn'tcomplained a little bit about his back, but he mostly complained about his back shoulder.
Q: How long before that last time you saw him alive had he had the shoulder surgery?
A: He had had his shoulder surgery two weeks prior to his death.
....
Q: All right. Now, tell us whether or not his condition changed after the shoulder surgery.
A: After the shoulder surgery, like I said, he was now dealing with the pains from the recovering from the shoulder surgery. Couldn't make certain motions and groaning. He couldn't get up and down without moaning and groaning.
Flaggs's attorney sought to exclude testimony regarding the surgeries in a motion in limine because he had only been made aware that Christopher and Archie intended to testify about the surgeries approximately one week before the trial. The trial judge denied the motion, and Flaggs does not challenge this ruling on appeal. Thus, even if Flaggs had been successful in preventing the admission of the apparatus, the jury still heard evidence of Wright's shoulder surgery and of his physical limitations following the surgery.
¶ 42. Flaggs has the burden of demonstrating that the admission of the shoulder apparatus resulted in a miscarriage of justice. Given that Flaggs admitted to stabbing Wright multiple times and that there was significant other evidence presented contradicting Flaggs's claim of self-defense, we find that Flaggs has not met this burden. See Isom v. State, 928 So.2d 840, 845-46(¶ 15) (Miss.2006) (finding that error in failing to follow Box procedure was harmless because the jury could have convicted even without the challenged evidence); Lofton v. State, 818 So.2d at 1237(¶ 32) (finding that, because the defendant's conviction was supported by the overwhelming weight of the evidence, he had not demonstrated a miscarriage of justice; therefore, any violation of URCCC 9.04 was harmless error); see also Prewitt v. State, 755 So.2d 537, 541(¶ 11) (Miss.Ct. App.1999) ("Where the discovery violation results in the admission of evidence that is merely cumulative, the error is harmless."). Accordingly, this issue is without merit.

CONCLUSION
¶ 43. We find no error by the trial court warranting reversal in this case. Accordingly, *408 we affirm the conviction and sentence.
¶ 44. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN PRISON IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] Box v. State, 437 So.2d 19, 23 (Miss.1983) (Robertson, J., specially concurring); incorporated into URCCC 9.04(I).
[2] The tape recording of the interrogation is not included in the record; therefore, the contents of the recording are taken from Flaggs's brief. We observed no substantial inconsistencies in the State's recitation of the contents of the recording and that of Flaggs.
[3] Byrd also stated that he knew Perry Tate, who was a possible witness at trial. Tate, however, was never called to testify.
[4] In Whittington, the defendant argued that the State's expert witness, a forensic pathologist, should not have been permitted to proffer an opinion regarding blood spatter on the victim's clothing. The court rejected this argument, stating as follows:

The record shows that in his professional career Dr. McCormick had performed several thousand autopsies of trauma victims. The matters upon which he expressed an opinion were clearly within his field of expertise, and he gave a detailed basis for every conclusion he reached and about which he testified. Mississippi Rules of Evidence 702-704 clearly authorized opinions of forensic pathologists such as those expressed by Dr. McCormick. Moreover, this Court has consistently recognized opinion evidence by forensic pathologists such as that given by Dr. McCormick. No error was committed in admitting such testimony of Dr. McCormick into evidence.
Whittington, 523 So.2d at 976 (internal citations omitted).
[5] Flaggs did not object at trial to Dr. Hayne's testimony on the grounds that it was speculative, nor does he raise this issue on appeal.
[6] The Russell court stated:

Where, as here, the defendant is surprised with new evidence and where, as here, that evidence was known to the prosecution, though only for a short time, and where, as here, that evidence is detrimental to a central theory of defense, the defendant is entitled, at the very least, to an interview with the witness.
Russell, 789 So.2d at 786(¶ 30).